# CASES DETERMINED

AT THE

# January Term, 1914.

---

WISCONSIN TRACTION, LIGHT, HEAT & POWER COMPANY, Appellant, vs. CITY OF MENASHA, Respondent.

*December 9, 1913—May 1, 1914.*

*Public utilities: Construction of statutes: Indeterminate permits: Abrogation of existing franchises: Constitutional law: Impairment of contracts: Estoppel: Right of city to do commercial lighting: Certificate of convenience and necessity, when required.*

1. The Public Utilities Law was framed upon the theory that the duplication of plants for the carrying on of certain kinds of business was undesirable because it resulted in economic waste, the loss from which in the end usually fell upon the consumer; and in construing the act the apparent purpose of the legislature should be kept in mind.

2. Ch. 596, Laws of 1911,—which provided that every franchise theretofore granted to a public utility by the state or any municipality was so altered as to constitute and be an indeterminate permit within the terms and meaning of secs. 1797m—1 to 1797m—108, Stats., and subject to all the terms, provisions, conditions, and limitations of said sections,—had the effect to abrogate a pre-existing franchise granted to a public utility by a city, at least so far as the provisions of the sections referred to were inconsistent therewith.

3. By force of said act of 1911, sub. 3 of sec. 1797m—74, Stats.,—which prohibits any municipality from constructing a competing plant where there is a public utility already in operation under an indeterminate permit, engaged in similar service in such municipality, without first obtaining a certificate of necessity from the railroad commission,—became part and parcel of the franchise of a public utility then operating under authority of a municipality; and a provision in the municipal franchise whereby the city reserved to itself the right to do a commercial lighting business was abrogated.

VOL. 157 — 1

4. The abrogation of such provision did not violate the constitutional inhibition against impairing the obligation of contracts, and was valid.

5. The legislature having power to enact such statute, the public utility is not estopped by anything contained in its former franchise, or by any waiver contained in its acceptance thereof, from claiming the benefit of any rights given by the substituted franchise.

6. A city in lighting its streets and public buildings performs a governmental function, while in supplying light to private consumers it performs a proprietary or private function. The two kinds of business are separate and distinct.

7. Where a city was engaged in the business of public lighting only when ch. 596, Laws of 1911, went into effect, and another public utility was at the time engaged in the business of commercial lighting under a municipal franchise which reserved to the city the right to do a commercial lighting business whenever it chose, the city could not thereafter avail itself of such reserved right without first obtaining a certificate of convenience and necessity from the railroad commission, under sec. 1797m—74, Stats.

8. The mere fact that the city had furnished a few lights to one private store building and one residence for a short time, the service being then discontinued because the city was unable to generate the necessary current, did not make the city a public utility doing a commercial lighting business, so as to exempt it from the provisions of sec. 1797m—74, Stats., where it had wholly ceased to do any private lighting for more than three years before the passage of the act of 1911.

9. The facts that the city, when it constructed its street lighting system, intended at some future time to embark in the business of commercial lighting, that some part of the equipment (such as the poles) could be used in that business, and that prior to the passage of ch. 596, Laws of 1911, it had declared its purpose to enlarge its plant so as to enter that field, no funds having yet been provided or expense incurred therefor, did not take the case out of the statute so as to render a certificate from the railroad commission unnecessary. *Neacy v. Milwaukee*, 151 Wis. 504, distinguished.

TIMLIN and KERWIN, JJ., dissent.

APPEAL from a judgment of the circuit court for Winnebago county: GEO. W. BURNELL, Circuit Judge. *Reversed.*

In the year 1904 the plaintiff was a public-service corporation and was engaged, among other things, in the business of

furnishing light and electric energy to municipalities and private consumers. On March 23d of this year the defendant granted plaintiff a franchise to erect poles and string wires thereon in the city and to furnish electric light and power to those desiring to use same. The franchise specified the rates to be charged for current for incandescent and arc lamps and for power. In the ordinance the city reserved the right to erect and maintain a competing plant for private lighting. It was expressly provided that the ordinance should not become effective unless within thirty days after its passage and publication the same was accepted and an express waiver was filed with the city clerk of all rights the plaintiff might have to object to the establishment of a commercial lighting plant by the city. Such acceptance and waiver were filed. The plaintiff constructed the necessary lines to supply private consumers and also furnished current for street lighting until the city constructed a plant of its own for this purpose.

About September 27, 1905, the city council passed a resolution reciting that it appeared that electric light could be furnished to the city of *Menasha* for the use of said city and its inhabitants more economically and with better service than the same was then being supplied and that in the judgment of the council such light could be most economically supplied by works owned by the city and that the best interests of the city called for the building of said works. The resolution further recited that it appeared from estimates obtained by the council that such works could be built at a cost of not exceeding $10,000, and, it appearing that the city had power under ch. 143 of the Laws of 1901 to build such works, it was resolved that the city build light works to supply the city and its inhabitants with light. A special election was provided for to vote on the proposition, and it was carried by a large majority.

On November 28, 1905, the city notified the plaintiff that it was about to install a plant to light its streets, but that such plant would not be ready for sixty days, and that in the mean-

time it would expect the plaintiff to continue lighting the streets according to the terms of its franchise. On January 2, 1906, the plaintiff was notified to cease furnishing current to the city thirty days thereafter. Since February 1, 1906, the city has done its street lighting. Whatever may have been the expectations of the city in respect to the adequacy of its plant, it proved to be wholly inadequate to supply current for commercial lighting. The building was built large enough to accommodate an additional engine for light work. It was thought after the plant was built that it had sufficient capacity to supply private consumers with light to some extent; so about June, 1906, a resolution was passed authorizing the committee on water and light to make immediate arrangements for supplying private consumers with light and for entering on a commercial lighting business in the city of *Menasha,* and for such purpose it was instructed to procure the necessary transformers and other equipment. In pursuance of this action about 620 feet of wire for commercial lighting was strung in 1906, and a small amount of current was for a time supplied to two or three private consumers. A fourth was supplied for a couple of days, but service was discontinued because of lack of power to generate the necessary current.

The plant installed consisted of a generator, switchboard, and necessary transformers and poles, the number of transformers purchased not exceeding three. The wires for private lighting were strung to the store building used by the then mayor, and also to the upstairs of the building, and to the residence of the mayor's partner some twenty feet from the store. The number of lights was from fifteen to twenty-five, and the revenue received therefrom was about $30. The service was begun about the middle of the year 1906 and discontinued about June, 1908, because the plant was unable to furnish the current. The machinery used seems to have been installed in the waterworks plant, and it rather appears by inference that the engine used for the pumping plant was

used to generate electricity also. From June or July, 1908, until the latter part of the year 1911 the city furnished no light to any private consumer.

On February 21, 1911, the city passed a resolution to borrow $40,000 to be used for the purpose of enlarging its lighting plant. On July 18, 1911, the city authorized the purchase of additional equipment for its lighting plant, and on October 19, 1911, it passed an ordinance providing for the issuance and sale of bonds to the amount of $40,000 to purchase additional equipment for the plant. The bonds were sold and the city proceeded to provide the necessary equipment to engage in the commercial lighting business. The plaintiff brings this action to restrain the city from so doing, and from a judgment in defendant's favor it prosecutes this appeal.

For the appellant there was a brief by *Van Dyke, Rosecrantz, Shaw & Van Dyke,* and oral argument by *Clarke L. Rosecrantz.* They cited *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 130 N. W. 530; *Calumet S. Co. v. Chilton,* 148 Wis. 334, 135 N. W. 131; *Cawker v. Meyer,* 147 Wis. 320, 133 N. W. 157.

For the respondent there was a brief by *D. K. Allen,* attorney, and *Silas Bullard,* of counsel, and a separate brief by *Henry Fitzgibbon,* of counsel; and the cause was argued orally by *Mr. Fitzgibbon* and *Mr. Allen.*

The following opinion was filed February 3, 1914:

BARNES, J. For many years prior to 1907 the plaintiff was a public utility. It did not elect to surrender its franchises and to take in lieu thereof the indeterminate permit provided for by the Public Utilities Law of 1907 (ch. 499), sec. 1797m—1, Stats., and succeeding sections.

Ch. 596, Laws of 1911, was published and became effective on July 8, 1911. This act in effect provided that any franchises theretofore granted to a public utility by the state or through any of its agencies was so altered and amended as to

constitute and be an indeterminate permit within the terms and meaning of secs. 1797m—1 to 1797m—108, inclusive, of the Statutes of 1898, and subject to all the terms, provisions, conditions, and limitations of said sections. The amended franchise is given the same force and effect as a license, permit, or franchise granted after July 11, 1907, to any public utility subject to the provisions of the Public Utilities Law of 1907.

Sub. 3, sec. 1797m—74, Stats., being part of the Public Utilities Act, provides:

"No municipality shall hereafter construct any such plant or equipment where there is in operation under an indeterminate permit as provided in this act, in such municipality a public utility engaged in similar service, without first securing from the commission a declaration, after a public hearing of all parties interested, that public convenience and necessity require such municipal public utility."

The appellant contends that by force of said ch. 596, Laws of 1911, it received an indeterminate permit in lieu of the existing franchises under which it operated, and became subject to the Public Utilities Law to the same extent that it would have become subject thereto had it surrendered its franchises under the 1907 law and elected to receive in lieu thereof an indeterminate permit as provided by ch. 499, Laws of 1907 (sec. 1797m—77). The plaintiff being subject to the Public Utilities Act after July 8, 1911, it insists that it was unlawful for the defendant city to engage in the business of commercial lighting after that date without a certificate of convenience and necessity from the railroad commission, and it is conceded that no such certificate was procured and it appears by inference that none was asked for.

The defendant insists that it had the right to proceed without any certificate from the railroad commission, for the following reasons:

(1) The clause in the franchise granted the plaintiff in 1904 by which the defendant expressly reserved to itself the right to engage in the business of commercial lighting is still

in force, and in any event, the plaintiff having accepted such franchise with the provision referred to, it should not now be heard to object to the right of the city to exercise the privilege so reserved.

(2) By a resolution passed February 21, 1911, the city, as it had the right to do at that time, evinced an intention to enlarge its plant so as to engage in the business of commercial lighting, and it should be held that thereafter the city became a public utility in the business of commercial lighting.

(3) The city was in fact a public utility engaged in the commercial lighting business since the summer of 1906, and therefore it was not affected by ch. 596, Laws of 1911.

The circuit judge held in substance that there was a contract between the parties by which it was agreed that the city might at any time engage in the commercial lighting business; that the obligation of this contract could not be impaired, although the legislature might prohibit the city from building a lighting plant; that the contract was not affected by ch. 596, Laws of 1911, and that under the provisions of the ordinance of 1904 referred to the plaintiff was estopped from claiming that the city did not have the right to engage in the commercial lighting business. The trial judge also said he was inclined to think the position was well taken that the city was a public utility engaged in the business of commercial lighting long prior to the passage of the act of 1911.

The Public Utilities Law was undoubtedly framed on the theory that certain kinds of business were of such a character that the duplication of plants for the purpose of carrying them on was undesirable because it resulted in an economic waste, the loss from which in the end usually fell upon the consumer. As to some kinds of business, such as that of operating telephone lines, duplication is not only an added expense to the user, but is apt to be a positive nuisance. Competition in the public utility business in our cities in the end generally resulted in consolidation or an agreement between competing companies as to the rates to be charged. In either

event the rates were usually adjusted so as to cover fixed charges and to yield a return on the cost of constructing the competing plants. These are matters of common knowledge. One of the main purposes of the law was to avoid duplication, and it was thought that by efficiently controlling the rates to be charged by a single utility the consumer would derive the benefit resulting from economy in production. In construing the Public Utilities Law the apparent purpose of the legislature should be kept in mind.

When ch. 596, Laws of 1911, was passed, it took from the plaintiff some rights and privileges which it had and conferred some privileges on it which it did not have. It also conferred some rights on municipalities in regard to acquiring existing plants which they did not before have. After the passage of this act, sub. 3, sec. 1797m—74, above quoted became part and parcel of the plaintiff's franchise.

The main propositions upon which this case was decided by the lower court would seem to be untenable under our decisions. In brief it was held in *La Crosse v. La Crosse G. & E. Co.* 145 Wis. 408, 130 N. W. 530, that when a public utility comes under the 1907 law it surrenders its existing franchise and that its rights and liabilities are then fixed and determined by the provisions of the Public Utilities Act. The writer of this opinion did not agree with the decision in the *La Crosse Case,* but has no doubt that where there is an express provision in the Public Utilities Law which is inconsistent with a provision contained in the franchise surrendered, the latter is abrogated. The quoted section of the Public Utilities Act is inconsistent with the provision of the 1904 ordinance granted to the plaintiff upon which the defendant relies; so the case here made by the plaintiff is stronger than that made by the defendant in the *La Crosse Case.* It is also decided in this latter case and in other cases that the provision of the 1904 ordinance relied on might be abrogated by the legislature. An agreement by which a city reserved the right to do a commercial lighting business has no

more of the essence of a contract protected by the constitution than one whereby the city was entitled to receive a license fee for the use of its streets, which was the question involved in the *La Crosse Case,* or one by which an interurban railway company agreed not to exact to exceed a certain rate of fare, which it was held did not deprive the legislature of the right to regulate rates in *Manitowoc v. Manitowoc & N. T. Co.* 145 Wis. 13, 129 N. W. 925. What was said in the *La Crosse Case* in reference to the effect of taking an indeterminate permit was approved in *Calumet S. Co. v. Chilton,* 148 Wis. 334, 356, 135 N. W. 131. The language of sub. 3, sec. 1797m—74, positively inhibits a municipality from constructing any plant or equipment where there is in operation under an indeterminate permit a public utility engaged in a similar service, without first procuring a certificate of convenience and necessity from the railroad commission. The plaintiff, after July 8, 1911, fully answered the calls of the statute, and the defendant had no right to proceed without the certificate unless prior to that date it had constructed a plant or equipment to engage in the business of commercial lighting within the meaning of the statute.

The argument is made that because the plaintiff accepted a franchise reserving to the city the right to engage in the commercial lighting business, it is now estopped from asserting that the city has no such right. The argument is not convincing. The plaintiff was apparently satisfied with its franchise. It might have voluntarily surrendered it and taken an indeterminate permit, but it did not see fit to do so. So long as it retained its original franchise the city had a perfect right to engage in the commercial lighting business. The legislature, however, intervened and took away the existing franchise of the plaintiff and substituted another for it. Plaintiff could no longer claim the benefits of its former franchise, and it would hardly seem fair to impose on it the burdens imposed by the old franchise, which were expressly taken away by the new. The state substituted a franchise of its

own making for one upon which the parties had agreed between themselves. Conceding that the power to do this existed, it is difficult to see how the plaintiff should be held estopped from claiming the benefits of any rights given by the substituted franchise.

The main contention of the respondent, as stated by its counsel, is that on July 8, 1911, and for a long time prior thereto the defendant was a public utility doing a commercial lighting business and therefore was not affected by ch. 596, Laws of 1911. The facts upon which this claim is based have been fully set out in the statement of facts.

A city in lighting its streets and public buildings is performing a governmental function. It is not liable for the negligence of its servants in performing that duty. On the other hand, when a city engages in the business of supplying light to private consumers, it is performing a proprietary or private function, and it is liable for the negligence of its servants. *Piper v. Madison,* 140 Wis. 311, 122 N. W. 730; *Evans v. Sheboygan,* 153 Wis. 287, 141 N. W. 265, and cases cited. The two kinds of business are separate and distinct. 1 Dillon, Mun. Corp. (5th ed.) § 109; *Ashland v. Wheeler,* 88 Wis. 607, 60 N. W. 818; *Kaukauna E. L. Co. v. Kaukauna,* 114 Wis. 327, 89 N. W. 542.

There can be no doubt that when the city built its original plant it was built for the purpose of lighting the streets, and possibly the public buildings owned by the city. It was built in the exercise of a governmental function. The resolution adopted was broad enough to cover both kinds of lighting, but the plant constructed was wholly inadequate for the dual purpose. It appears from the evidence of one witness that the building in which the equipment was placed was large enough to accommodate another light engine. Other evidence indicates that the equipment was placed in the waterworks building. After the plant had been running a few months it was thought that some private lighting could be done, so wires were run some six or seven hundred feet to

the store building of the mayor, and that was lighted on the first and second floors, as well as the dwelling house of the mayor's partner, located about twenty feet from the store. These lights were discontinued about the middle of the year 1908, because the city was unable to generate the necessary current to run them.    Thereafter for a period of more than three years before the passage of ch. 596, Laws of 1911, no private lighting was done by the city.    In addition to the private lighting done as above stated, the city furnished current for two days in 1906 or 1907 to one other consumer, but was obliged to quit because it could not generate the necessary current.    The original proposed expenditure for a lighting plant was only $10,000.    No doubt the poles used for public lighting might also be used in connection with the business of private lighting, and possibly some of the other equipment.    The only equipment which the city appears to have had which was not an essential part of the public lighting plant consisted of two or three transformers, two or three poles, and six or seven hundred feet of double wire.    These were procured or constructed in connection with the lighting of the mayor's store building and the residence of his partner.

Under the facts stated we do not think the city was a public utility engaged in the business of commercial lighting at any time prior to July, 1911.    According to the census of 1905 the city of *Menasha* had a population of 5,960.    The furnishing of a few lights to one store and one residence for a short time, we do not think made the city a public utility under the doctrine of *Cawker v. Meyer,* 147 Wis. 320, 133 N. W. 157.    However this might be, the city had ceased to perform any function as a public utility for more than three years before the passage of the 1911 act.

It is true that the action of the city in 1911 contemplated the enlargement of the existing plant, but the purpose of making the enlargement was to enable the city to embark in a new and independent business, to wit, that of furnishing commercial light in its private or proprietary capacity.    To

this end bonds to the amount of $40,000 were sold. Nothing, however, was done toward extending the plant or voting the bonds therefor until after July 8, 1911, except that on February 21, 1911, the council passed a resolution which amounted to a declaration of intention to enlarge the existing plant so as to engage in the business of commercial lighting.

After July 8, 1911, the plaintiff was a public utility operating under an indeterminate permit and furnished light to the inhabitants of the city of *Menasha.* The city was not and had not been engaged in this business for at least three years, and we think never had been engaged in such business. Under the statute quoted the city was prohibited from "constructing any plant or equipment" for the purpose of engaging in the field occupied by the plaintiff, without the consent of the railroad commission. When the original plant was constructed, it may have intended and probably did intend to embark in the commercial lighting business at some future time, but it did not do so or take any steps in that direction until after July 8, 1911.

Respondent's counsel argue that under the decision in *Neacy v. Milwaukee,* 151 Wis. 504, 139 N. W. 409, the city became a public utility for the purpose of engaging in the lighting business prior to July 8, 1911. The cases are very dissimilar in their facts. Five years before the Public Utilities Law was passed, the city of Milwaukee determined to erect a municipal lighting plant and voted bonds for that purpose in 1904. It was tied up by various proceedings in the courts, but in 1906 it issued bonds for this purpose to the amount of $150,000 and purchased a site for $60,000. Before the Public Utilities Law was passed the city expended other large sums of money for and in connection with the construction of an electric light plant. Under these circumstances it was perhaps inferentially held in the *Neacy Case* that a certificate from the railroad commission was not necessary, because the city had reached a definite conclusion to build, had provided the necessary funds therefor, had pro-

cured its site, and was building as rapidly as it could before the Public Utilities Law was passed and when it had a perfect right to proceed without any certificate of convenience and necessity. About all that can be said in the instant case is that the city from 1905 on and prior to July 8, 1911, evinced an intention to embark in the commercial lighting business at some indefinite time in the future, and that it had made some trifling expenditures in connection with the lighting of the store building and residence referred to. No definite steps were taken to enter the private lighting field and no funds were provided for that purpose until after July 8, 1911. It is reasonable enough to say that sub. 3, sec. 1797m—74, was not intended to prevent the completion of a plant where the construction of one was well under way when the law was passed. We think it would not be a reasonable construction of it to hold that mere intention to build a plant would be sufficient to render the law inapplicable.

*State ex rel. Kenosha G. & E. Co. v. Kenosha E. R. Co.* 145 Wis. 337, 129 N. W. 600, has some bearing on the question. There the city entered into a contract with the street railway company to do its lighting, and the latter expended a considerable sum of money to provide the necessary equipment to carry out its contract. Before the city succeeded in passing an ordinance granting the street railway company the right to place its poles and wires in the streets, the Kenosha Gas & Electric Company surrendered its franchise and took the indeterminate permit provided for by the Public Utilities Law, and it was held that the ordinance passed after such surrender was void and that the street railway company acquired no rights thereunder. The fact that a preliminary contract was entered into and considerable expenditures were made thereunder before the competing utility took an indeterminate permit was not considered sufficient to deprive it of the benefits conferred by sub. 1, sec. 1797m—74.

The respondent no doubt constructed its plant in the best of faith. We realize that this decision leaves it in an unfor-

tunate predicament. We think the law is reasonably plain, and, thinking so, it is not for us to undertake to amend it or to defeat the legislative will by indulging in a strained construction of it. Our duty is to declare the law as it is written. If it deals harshly with the defendant, it has its remedy before the railroad commission or the legislature. Where a city builds a plant adequate only for the purpose of doing its own lighting, but intends to enter another field of operation in the indefinite future, we do not think it can reasonably be said that because of such intention and because a small portion of the equipment in use may also be useful in the new operation, it is in fact engaged in such new operation. We cannot escape the conclusion that prior to July 8, 1911, the city had built and was operating a plant to do its own lighting, and that thereafter it provided the necessary funds and proceeded in its proprietary capacity to provide a plant to furnish commercial lighting, and that in doing so without a certificate of convenience and necessity from the railroad commission it was constructing and equipping a commercial lighting plant in violation of sub. 3, sec. 1797m—74, because there was already a public utility operating such a plant in the city under an indeterminate permit.

*By the Court.*—Judgment reversed, with directions to enter judgment in accordance with this opinion.

TIMLIN, J. (*dissenting*)   It is uncontroverted that the defendant city took all the legal steps necessary to establish its right and power to build a lighting plant to supply the city and the inhabitants thereof with light under ch. 143, Laws of 1901. These steps were taken and the plant built and in operation long prior to July 8, 1911, when the plaintiff became the owner of an indeterminate permit. The city had acquired and built the plant and the plant was in operation during 1906, to say the least. It is argued that the city did not at once or did not prior to July 8, 1911, efficiently equip this plant for both kinds of lighting, but confined its work to

municipal lighting, and that its efforts at commercial lighting were few and feeble. I regard this part of the argument of counsel as immaterial, mere dust-throwing with the effect of obscuring the real point.

We start out with the proposition that the city had a lawful charter for both kinds of lighting, had its site purchased and its plant in operation for municipal lighting, waiting, as it lawfully might, before making the additional outlay for further extension. That the city never abandoned its rights so acquired is uncontroverted, and is further shown by the express contract with plaintiff with reference to this condition, recognizing the right and power of the city to enlarge its plant for the purpose of commercial lighting. The real significance of this stipulation is to show that there was no abandonment by the city, but a mere *ad interim* authority given to the plaintiff, a passerby, an interurban railway with no plant in the city but carrying a current through the city, to do commercial lighting until such time as the city should further enlarge its plant acquired for that purpose. I think the city lost no rights which it had acquired under ch. 143, *supra,* by delaying to extend its activities to commercial lighting under such circumstances. It did not if a city has the same rights under ch. 143, *supra,* as corporations organized for private gain have. Such as street railways under sec. 1862, Stats. (*Wright v. Milwaukee E. R. & L. Co.* 95 Wis. 29, 69 N. W. 791), or such as an electric company has under sec. 1797m—74 (*Calumet S. Co. v. Chilton,* 148 Wis. 334, 135 N. W. 131). In the case last cited it is said at page 367:

"Excusable, temporary suspensions, involving no purpose to abandon, the owner being willing and seasonably, under the circumstances, able to resume and doing so, as in this case, satisfies the calls for a 'public utility operating under,' etc."

Municipal corporations should not lightly be held to have abandoned their charter powers, nor should statutes conferring power upon such corporations to acquire and operate property in their proprietary capacity be considered repealed

by implication or modified by any loose construction of subsequent statutes after the city has invested its money in such property.   I regard the rights of the city as fixed prior to July 8, 1911, and think this case should be ruled by the principle deducible from *Neacy v. Milwaukee,* 151 Wis. 504, 139 N. W. 409.   The city was therefore not required to obtain a certificate of convenience and necessity from the railroad commission.   The legislative intention that such was the law prior to July 10, 1913, and therefore applicable to this case, is persuasively indicated by the enactment of ch. 621, Laws of 1913 (sec. 1797m—74n).

I am authorized to say Mr. Justice KERWIN concurs in this dissent.

A motion for a rehearing was denied, with $25 costs, on May 1, 1914.