Central Wisconsin Power Company and another, Appellants, vs. Wisconsin Traction, Light, Heat & Power Company and another, Respondents.

*May 14—June 21, 1926.*

*Public utilities: One utility furnishing power to another: Indeterminate permit: Constitutional law: Construction of statute giving monopolistic privileges.*

1. Where a city as a public utility maintained a power plant, a corporation which contracted to deliver electric power to the city plant and construct its line upon streets of the city for that purpose under authority of an ordinance, did not thereby acquire an "indeterminate permit" within the mean-

558    SUPREME COURT OF WISCONSIN.   [June

Central Wis. P. Co. v. Wis. T., L., H. & P. Co. 190 Wis. 557.

ing of sub. (5), sec. 196.01, Stats., which could only be terminated as provided in secs. 196.01 to 197.10, as the corporation was not dealing with the public and acquired no certificate of convenience and necessity under sec. 196.50, and no effort was made to divide the field.   pp. 566, 569.

2. This court cannot by construction extend a statute conferring a monopolistic privilege upon a public utility beyond the boundaries marked out by the legislature.   p. 569.

APPEAL from a judgment of the circuit court for Waupaca county: BYRON B. PARK, Circuit Judge.   *Affirmed.*

The *Central Wisconsin Power Company* is a subsidiary of the *Wisconsin Power & Light Company* and the interest represented by these companies will be spoken of as one and they will be designated as plaintiff.   Both companies are engaged in the public utility business.   The *Wisconsin Traction, Light, Heat & Power Company* is a Wisconsin utility corporation.

Prior to January 7, 1919, the city of *Clintonville* was engaged in operating a municipal lighting plant, including a generating and distributing system.   On that day it entered into an agreement with the plaintiff by which it was agreed that the plaintiff should keep available for the use of the city a maximum of 475,000 kilowatt hours annually of electrical energy.   For this the city was to pay two and three-quarter cents per kilowatt hour.   As a result of preceding negotiations, on the 14th day of July, 1925, the defendant company entered into a contract with the city of *Clintonville* to furnish it all of the electrical energy which it might require for a five-year period commencing November 1, 1925.   The plaintiff in the month of November, 1925, began this action to restrain the defendant from interfering with the relation of the plaintiff to the city of *Clintonville* and from interfering with the right of the plaintiff to furnish electrical energy to the city of *Clintonville,* and to restrain the defendant from further proceeding with the construction and erection of its power line for the pur-

pose of carrying out its contract with the city of *Clinton-ville*. There was a temporary injunction issued in accordance with the prayer of the complaint. During the pendency of this injunction there was a trial of the issues. In March, 1926, the decision of the trial court was filed, and on March 17, 1926, formal findings were filed, pursuant to which judgment was entered dismissing the plaintiff's complaint upon the merits. The facts were presented briefly and clearly in the findings of fact, which are as follows:

"(1) That on or about the 7th day of January, 1919, the plaintiff, *Central Wisconsin Power Company* (then known as Clintonville Power Company), and the city of *Clintonville* entered into a contract by which the Power Company agreed to furnish the city with certain specified, and to be specified, quantities of electrical energy for a period of ten years, beginning upon or about the first day of February, 1919; that concurrently with the execution of such contract the city of *Clintonville,* by ordinance, authorized the Power Company to construct such lines upon the streets in the city of *Clintonville* as might be necessary to deliver such energy to the electric municipal utility of the city, and said ordinance also authorized the Power Company to use said streets for the construction and maintenance of such lines as might be required to enable the Power Company to furnish electrical service to the Four Wheel Drive and to the Topp-Stewart Tractor Company.

"(2) That at the time of the execution of such contract and continuously thereafter, the city of *Clintonville* owned and still owns and operates an electrical utility within the limits of said city, and such utility is the only electrical utility in said city.

"(3) That the Power Company on the date of the execution of said contract owned and operated a hydro-electric plant at Heyman Falls, located approximately thirteen miles north and west of the city of *Clintonville;* that said contract contemplates that the energy to be delivered thereunder shall be generated at such hydro-electric plant.

"(4) That shortly after the execution of such contract the Power Company began the delivery of energy to said city; that during each of the years 1922, 1923, 1924, and

1925 the Power Company failed to deliver any energy to the city of *Clintonville* for varying periods, mostly twelve hours or less, totaling upwards of thirty days of twenty-four hours each; that such total periods during which no energy was furnished to the city increased with each successive year from a total period of about forty days in 1922 to a total aggregate period of upwards of sixty days in 1925.

"(5) That during the periods when no service was rendered by the Power Company to the city of *Clintonville,* the city, in order to provide light and power for the city and its inhabitants, necessarily operated a plant owned by the city and belonging to the city's electric municipal utility and adapted for the generation of electricity from steam; that such energy was produced by the city at its steam plant at a cost in excess of six cents per K. W. H.; that the cost to the city for the energy so generated during the years 1922, 1923, 1924, and 1925, and necessarily used by the city's electric utility, necessarily cost the city a total aggregate sum of approximately $10,000 in excess of the amount which the city would have paid for such energy under the rates specified in said contract of January 7, 1919. That it is established by the undisputed testimony that sixty interruptions of service of a duration of twelve hours each, or 120 interruptions of a duration of six hours each, would be more burdensome to the city than thirty interruptions of twenty-four hours each.

"(6) That by the terms of said contract the city is authorized to increase or decrease, within certain limits, the amount of energy to be reserved for delivery to the city by the Power Company; that pursuant to such provisions the city has duly requested the Power Company to reserve and deliver to it 600,000 K. W. H.'s annually, but the largest amount of energy which has been delivered by the Power Company to the city in any contract year is approximately 500,000 K. W. H.'s; that said contract provides that the city cannot reduce the amount of energy to be reserved for it below 475,000 K. W. H.'s annually, and that the city must use, or, if it does not use, it must pay for, at the contract unit price per K. W. H., at least three quarters of the minimum of 475,000 K. W. H.'s, or 356,750 K. W. H.'s per year.

"(7) That in March, 1925, the city applied by letter to the railroad commission of Wisconsin for a determination that the said contract of January 7, 1919, was void because of the Power Company's breach; that the hearing on this application before some of the staff of the railroad commission was on March 21, 1925. The city, represented by its city attorney, maintained that the contract was void because of default on the part of the Power Company; and also maintained that the Power Company did not have an indeterminate permit. The Power Company, represented by its president and others, did not deny the city's claims and contentions. Evidence of the hours when the city was obliged to operate its steam plant was taken. The representatives of the city and the Power Company then entered into a tentative agreement, so called, which is set forth in Exhibit C, a letter from the railroad commission to the city attorney and the president of the Power Company. The City Light & Water Commission refused to sanction the agreement or to recommend the contract, and the railroad commission was so notified by letter dated April 27, 1925; and the Power Company also had notice thereof. All the construction work of the Power Company on its lines was done after this date. In Exhibit C the railroad commission refer to the contract of January 7, 1919, as a 'contract now expiring by default.'

"(8) The municipal utility of the city would probably be able to sell and use a total of about 2,000,000 K. W. H.'s annually, if a supply of such energy was available to the city's utility at rates substantially like the standard rate of the defendant Traction Company.

"(9) In May, 1925, the common council of the city resolved to enter into a contract with the Traction Company for the supply of electrical energy by the Traction Company in such quantities as the city might require for its exclusive use at the Traction Company's standard rate, which rate was first put into effect as early as 1920, and under which the Traction Company is now supplying energy to the cities of New London, Shawano, Kaukauna, and other municipalities; that such rate contains a variable coal factor which operates automatically to increase or decrease the cost of service to the customer according to variation in the cost of

coal; that the quantities of energy heretofore used by the city's municipal utility, if purchased at the defendant Traction Company's standard rates, would result in a saving to the city of at least $5,000 per year, compared with the cost of such energy at the rates set forth in the contract of January 7, 1919.

"(10) Following a resolution of the common council, the city, in the month of June, contracted with the Traction Company for electrical energy at the Traction Company's standard rate, and by such contract the city agreed to purchase its wholesale supply of electrical energy from the Traction Company exclusively; that in the negotiations leading up to said contract the Water & Light Commission of said city was advised by the city attorney that said contract of January 7, 1919, was void for breach, and the said Water & Light Commission, in good faith, so represented to the Traction Company.

"(11) That the plaintiff Power Company, without having secured the approval of the railroad commission, and without having offered such rate to any other customer, billed the city of *Clintonville* for energy furnished during the month of December, 1925, at the rates specified in the Traction Company's standard rate; that such bill was paid under stipulation that it should be without prejudice to the rights of the city.

"(12) That on or about the 11th of November, the defendant Traction Company, having procured the acceptance by the railroad commission of Wisconsin of its standard rate as applicable to the delivery of wholesale energy to the city of *Clintonville,* was enjoined by temporary restraining order issued by this court from constructing a transmission line to supply such energy to the city and from furnishing any energy; that such restraining order was modified thereafter so as to permit the defendant Traction Company to construct such line, and said line was constructed and the defendant Traction Company was ready, able, and willing to furnish service to the city of *Clintonville* on or before the 31st day of December, 1925.

"(13) That by letter dated November 11, 1925, the defendant Traction Company advised the city of *Clintonville* that it thereby waived the exclusive feature of its contract

with the city and stood ready to furnish such electrical energy as might be required for the operation of the city's utility and which the city was not obligated to purchase from other sources.

"(14) That the authority granted by the city by ordinance of January 7, 1919, to the Power Company to furnish service to the Four Wheel Drive and to the Topp-Stewart Tractor Company, has never been exercised by the Power Company; that such authority has never been approved by the railroad commission of Wisconsin as a division of the service field in said city.

"(15) The defendant Traction Company claims no franchise right in the city and seeks only to deliver to the city from a transmission line which will not be tapped between the village of Bear Creek and the city, such energy as the city may require for purposes of its electrical utility and which it is not bound to purchase from other sources.

"(16) Plaintiff Power Company made no reply to the letter of the railroad commission, March 23, 1925, that the Power Company contract with the city was 'expiring by default;' that the plaintiff Power Company knew of the city's negotiations and of its contract with the Traction Company at or about the time that such transaction occurred; that the plaintiff Power Company knew during such period that the city insisted that the contract of January 7, 1919, had been breached and was not binding upon the city; that the plaintiff Power Company has repeatedly since March, 1925, sought to induce the city to enter into a new contract for electrical energy, but the city has refused to do so; that since the city's negotiations with the Traction Company it has consistently taken the position that the contract of January 7, 1919, has been breached by the Power Company and is no longer binding upon the city, and such position was reiterated upon the trial by the mayor and city attorney of the city.

"(17) That under the Traction Company standard rate, minimum payment which the city would be required to make after the current year, in the event it used no service thereunder, would be $1,350 per year.

"(18) That up to December 31, 1925, said city continued to take electrical energy from the plaintiff Power Company

because of its inability to purchase the same from any other source, and because the operation of the city's steam plant would not, from and after October 1, 1925, be sufficient to carry the city's peak load, and the operation of such steam plant would increase the amount of the city's damages sustained by reason of the plaintiff Power Company's breach of contract; that since December 31, 1925, and up to the time of trial the city has continued to take energy from the plaintiff Power Company for the reasons hereinbefore mentioned and for the additional reason that the defendant Traction Company, although ready, able, and willing to supply such energy, has been forbidden from doing so by the temporary restraining order of this court."

The court concluded as a matter of law that —

"(1) The *Central Wisconsin Power Company* has no indeterminate permit in the city of *Clintonville.*

"(1½) The parties to the contract of January 7, 1919, from and after the 21st day of March, 1925, to some time in the fall of 1925, treated the contract as having been terminated by the default of the Power Company; and the city of *Clintonville* through its officers has at all times so treated it after said date in March.

"(2) That even if the contract of January 7, 1919, were in force and effect, the city's obligation thereunder is limited to the payment of the minimum sums therein indicated.

"(3) The city has, by its course of conduct, of which the plaintiff Power Company has at all times been aware, elected to treat the contract of January 7, 1919, as breached and as no longer binding upon said city.

"(4) Judgment should be entered herein dismissing the complaint upon the merits and vacating temporary restraining order heretofore entered herein, in so far as the same restrains the defendant Traction Company from delivering electrical energy to the city for the purpose of the city's electrical utility.

"(5) The defendant Traction Company is entitled to recover its taxable costs and disbursements."

From the judgment entered accordingly plaintiff appeals.

For the appellants there was a brief by *Schubring, Ryan, Clarke & Petersen* and *Olin & Butler,* and oral argument

by *William Ryan, E. J. B. Schubring,* and *R. M. Rieser,* all of Madison.

For the respondent *Wisconsin Traction, Light, Heat & Power Company* there was a brief by *Shaw, Muskat & Sullivan* of Milwaukee, attorneys, and *F. W. Grogan* of Appleton, of counsel, and oral argument by *James D. Shaw.*

A brief was also filed by *Goggins, Brazeau & Graves* of Wisconsin Rapids, attorneys for Otto Zachow and the City Light & Water Commission of Clintonville.


ROSENBERRY, J.  Although the plaintiff was authorized to construct such lines upon the streets in the city of *Clintonville* as might be required to enable the plaintiff to furnish electrical service to the Four Wheel Drive and to the Topp-Stewart Tractor Company, it has never exercised that power, and the court found that such authority had never been approved by the railroad commission as a division of the service field in the city of *Clintonville.*  That element therefore drops out of consideration.

It is the contention of the plaintiff that under the terms of the ordinance authorizing the plaintiff to construct such lines upon the streets in the city of *Clintonville* as might be necessary to deliver the electrical energy to be furnished by it to the electric municipal utility of the city, the plaintiff acquired an indeterminate permit, it having in that respect complied with the terms of the ordinance; that such indeterminate permit gives it the exclusive right to furnish electrical energy to the city of *Clintonville* and that an existing indeterminate permit can be terminated only in the manner provided by statute; that the indeterminate permit of the plaintiff not having been terminated, the exclusive right of the plaintiff to furnish the city of *Clintonville* with electrical energy continues, and the contract by which the defendant company agrees to furnish and the city of *Clintonville* agrees to accept electrical energy from the defendant

is an unwarrantable interference therewith and invasion of the plaintiff's rights which will be protected in a court of equity.

It is further contended that the defendant has no right to furnish electrical energy to the city of *Clintonville* because it has not obtained a certificate of convenience and necessity as required by the terms of sec. 196.50, Stats.

Both the plaintiff and the defendant are public utilities. As already indicated, the fundamental question in this case is, Has the plaintiff, under the facts and circumstances set out in the findings, an indeterminate permit? The term "indeterminate permit" (sub. (5), sec. 196.01, Stats.) is defined as follows:

"The term 'indeterminate permit' . . . shall mean and embrace every grant, directly or indirectly, from the state, to any corporation, company, individual, association of individuals, their lessees, trustees or receivers appointed by any court whatsoever, of power, right or privilege to own, operate, manage or control any plant or equipment or any part of a plant or equipment within this state for the production, transmission, delivery or furnishing of heat, light, water or power, either directly or indirectly, to or for the public, which shall continue in force until such time as the municipality shall exercise its option to purchase as provided in sections 196.01 to 197.10, inclusive, or until it shall be otherwise terminated according to law."

The plaintiff had no grant of privilege directly from the state. Such privilege as it had it enjoyed under the ordinance referred to in the findings of fact. By the terms of this ordinance the predecessors of the plaintiff were "granted and vested with the franchise, permit, and privileges to use the streets, alleys, and public ways now existing, or which may hereafter be acquired or laid out in the city of *Clintonville,* for the purpose of bringing into the city and delivering to said city of *Clintonville* electricity for light, heat, power, and other purposes for which electricity may be used, to be distributed by the city in public service," etc.

Sec. 4 of the ordinance provides that the franchise and privileges granted by the ordinance "shall be determined by the life of a contract entered into by and between Clintonville Power Company and the city of *Clintonville* on the 7th day of January, 1919." The city of *Clintonville* had, prior to the time of entering into the contract, maintained its own plant for the generation of electrical energy. Language could hardly make clearer the intention of the parties, which was that the plaintiff should deliver to the city, a public utility, electrical energy to be distributed by the city to the consumers, and for the purpose of delivering such energy the plaintiff was authorized to erect and maintain the necessary electrical equipment in the streets of the city. Was this a grant of power from the city as agent of the state to furnish light, heat, and power for the public either directly or indirectly? Manifestly, the plaintiff dealt with the public in no respect whatever. If it can be said under such an arrangement as was here entered into between the city of *Clintonville* and the plaintiff that the plaintiff furnished light, heat, and power to the public indirectly, that would be equally true of a coal dealer who erected a coal chute for the purpose of delivering coal to the generating plant owned by the city. The statute expressly declares that a city owning and operating an electrical plant such as the city of *Clintonville* owned and operated is a public utility, so that we have in this case one public utility dealing with another. In making the contract the city acted in its proprietary capacity. In its governmental capacity, by the adoption of the ordinance it permitted the plaintiff to use the streets of the city for the purpose of carrying out its contract with the city as a proprietor. It did not thereby grant any franchise to the plaintiff to serve the public, but reserved that function to itself.

The term "public utility" is defined in the same section in which "indeterminate permit" is defined. The relevant

part of the definition of the term "public utility" is as follows:

"It shall embrace every corporation . .. . that now or hereafter may own, operate, manage, or control any plant or equipment or any part of a plant or equipment within the state, for the conveyance of telephone messages or for the production, transmission, delivery, or furnishing of heat, light, water, or power either directly or indirectly to or for the public. . . ."

The two things are defined, as will be seen, in almost identical terms. Furnishing heat, light, or power to the public makes the company furnishing it a public utility; a franchise given to a public utility to furnish heat, light, and power to the public is an indeterminate permit. The plaintiff did not deal with the public directly or indirectly. It dealt with the city in its proprietary capacity. In *Chippewa Power Co. v. Railroad Comm.* 188 Wis. 246, 205 N. W. 900, it was held that a corporation which leased its property and equipment to a public utility for the purpose of enabling the utility to furnish light, heat, or power to the public was not a utility. The mere leasing of its power to a utility was not furnishing heat, light, or power to the public. That case is decisive of the issues in this case. A public utility which has a contract with another public utility to furnish electrical energy which the second utility distributes to the public is not furnishing it to the public so as to make its use of the streets for the purpose of delivering the energy an indeterminate permit. It is quite apparent that the plaintiff did not regard its permit to occupy the streets of the city of *Clintonville* for the time and purpose specified as an indeterminate permit, for it did not apply for a certificate of convenience and necessity under the provisions of sec. 196.50, and its occupancy of the streets of the city of *Clintonville* without such certificate, if the grant amounted to an indeterminate permit, was in violation of positive statute. The plaintiff is here claiming that the defendant utility

cannot be permitted to do the very thing the plaintiff did until the defendant utility first procures a certificate of convenience and necessity. If that is a sound argument it is as good in one case as in the other.

It is also to be noted that if the permit to occupy the streets in the city of *Clintonville* amounted to an indeterminate permit there are two mutually exclusive indeterminate permits in operation within the corporate limits of that municipality at the same time, for municipalities are brought within the terms of the indeterminate permit provision of the public utility law as are private corporations. Although the city of *Clintonville* owned and operated its own generating plant, there was no attempt made to divide the field as provided in sub. (5) of sec. 197.01.

A powerful argument is made here to the effect that if it be held that the plaintiff, under the circumstances disclosed by the statement of facts, has no indeterminate permit, the element of competition will be reintroduced into the public utility field with serious consequences to the public and the utilities. If we were sitting as members of the legislative branch of the government, these arguments would furnish much food for thoughtful consideration. An indeterminate permit gives, within the limitations imposed by the statute, a monopolistic privilege and confers valuable rights and benefits. It is certainly not the function of the court by a construction to extend a statute of that character beyond the boundaries marked out by the legislature. The extension of privileges of that character involves weighty questions of public policy which are peculiarly for the legislative branch.

The plaintiff having no indeterminate permit, it has no exclusive right to sell electrical energy to the city of *Clintonville*. The plaintiff having no indeterminate permit, the issues raised by the defendant utility's answer were not triable in this action as a defense, and we therefore shall upon this appeal entertain no questions raised in respect

thereto.    The defendant utility prayed for no affirmative relief.

*By the Court.*—The judgment directing that the complaint of the plaintiffs be dismissed upon the merits and that the temporary restraining order be vacated and set aside is affirmed, and the restraining order entered in this court pending the appeal is vacated and set aside.