WISCONSIN POWER & LIGHT COMPANY, Appellant, vs. CITY OF BELOIT and others, Respondents.

*March 6—June 5, 1934.*

440

For the appellant there were briefs by *Schubring, Ryan & Petersen* of Madison, and oral argument by *William Ryan*. For the respondents there was a brief by *Clarence L. Haugan* of Beloit, attorney, and *Anan Raymond* and *Poppenhusen, Johnston, Thompson & Cole*, all of Chicago, of counsel, and oral argument by *Mr. Haugan* and *Mr. Raymond*.

A brief was also filed by *Robert J. Cunningham* of Janesville, counsel for the League of Wisconsin Municipalities, as *amicus curiæ*.

The following opinion was filed April 3, 1934:

FOWLER, J. The answer of the city of Beloit, while extended to great length, does not deny any of the allegations of fact of the complaint contained in the preceding statement of facts. It does deny that the plaintiff has the exclusive right to furnish municipal service, but that is a question of law. It thus only raises the questions of law whether under the allegations of the complaint the plaintiff, as the only public utility operating in the city under an indeterminate permit, now has, under the public utility law, the exclusive right and privilege of furnishing electrical current for the lighting of the streets and public buildings and

grounds of the city and light, heat, and power for other municipal purposes; and whether, if the plaintiff has such exclusive privilege, the city may construct and operate its proposed plant and equipment for such purposes without procuring a certificate of convenience and necessity therefor from the public service commission. No other questions are mentioned in the briefs, and we take it these are the only questions counsel for the city consider to be in issue.

1. The rights of the parties herein are governed by the public utility law. The provisions of that law bearing upon the questions above stated were directly before the court in *Calumet Service Co. v. Chilton,* 148 Wis. 334, 135 N. W. 131. The city council of Chilton had adopted a resolution purporting to authorize the construction of a plant and equipment for furnishing electrical light and power to the inhabitants of the city and to the city for lighting its streets and public buildings. A utility was operating in the city under an indeterminate permit, as the plaintiff is operating in Beloit. The city was threatening to carry out its resolution. The public utility brought an action to enjoin the city "from building any municipal plant for the purpose of furnishing electric power or lighting to the said city or its inhabitants." In that case this court went thoroughly into the subject of the rights and privileges of utilities operating under indeterminate permits and considerately and deliberately decided that the indeterminate permit of the plaintiff public utility covered both service to the inhabitants of the city and to the city for the lighting of its streets and public buildings, and held the utility had the exclusive right to furnish both kinds of service. The court also decided that the city could not proceed with the construction of its proposed plant without first procuring a certificate of convenience and necessity from the railroad (public service) commission, or purchasing the utility's plant under the provisions of the utility statutes.

The interpretation of the law declared by the court in the *Chilton Case* was in accordance with the general understanding of those active in its enactment and those familiar with the agitation that resulted therein. Such was the idea of those who had in charge the drafting of the law. These gentlemen were advised and aided by Professor John R. Commons and others acting in the public interest. The well-known purpose of the enactment was to avoid unnecessary duplication to the end that both municipal and private service would be secured at the lowest rate consistent with proper service and fair return on economical investment with economical operation. This, it was considered, could only be procured by having both municipal and private service rendered by a single utility. Public lighting constituted and still constitutes so large a part of the income of utilities, especially in the smaller municipalities, that depriving them of the privilege of furnishing this service and bestowing it upon another, whether the municipality or another utility, would necessarily increase the cost of the service to both the municipality and its inhabitants. This idea is well exemplified by the excerpt in the foot-note taken from page 16 of a pamphlet issued by the railroad commission, containing an address by Halford Erickson, member of the railroad commission.[1]

---

[1] "In connection with the applications for certificates of convenience and necessity that have come before the Wisconsin Commission, I have often had occasion to investigate the effect upon the existing utility and customers as well as upon the municipality of dividing up its business with an additional plant. In these investigations I have almost invariably found that such a division of the business would have greatly reduced the net earnings of the existing plant, while at the same time it would have seriously increased the cost per unit of service to the public. Time will not permit us to go into details. But in one case where the city officials desired to erect a municipal plant for the purpose of lighting its streets and public buildings, it was found that the granting of this application would have decreased the revenues of the existing company by considerably more than twice as much as it would have decreased its expenses;

Whether the application particularly referred to in the foot-note was made before or after the decision in the *Chilton Case* was rendered does not appear. But from the files of the public service commission, of which we may take judicial notice, it does appear that one application by a city wherein a public utility was operating under an indeterminate permit for a certificate of convenience and necessity for the construction of a plant for lighting streets and public buildings was made prior to that decision, and that four or five such applications have been made since. From this it would appear that before that decision was rendered it was understood by both municipalities and the commission, and since then has been understood, that it is necessary to procure such a certificate before a municipality can enter upon the construction and operation of a plant solely for such municipal service where an existing public utility is operating. The fact that this is the first time since the rendition of that decision that a municipality wherein a public utility was operating under an indeterminate permit has attempted to construct a plant for municipal service without applying for a certificate of convenience and necessity, as we may properly infer from the absence of court actions in which the right to construct such a plant without so applying has been asserted, is quite convincing proof that the *Chilton* decision has been generally considered as settling the questions here involved.

2. The holding of the *Chilton Case* has never been overruled. The decision of the case lays down a rule of property

that it would have caused an increase of about fifteen per cent in the cost to the city of the street and other public lighting; that it would have increased the cost per kilowatt-hour to private lighting and power users of the city by nearly twenty per cent; and that these increases in the costs were far-reaching enough so that under rates that were high enough to cover them it would have been impossible to expand the electrical business or even to retain all of the business the existing plant then had. To have granted the certificate under such circumstances could hardly have been in line with public policy. . . ."

that has stood as the law of this state for over twenty years. In reliance upon the law as there declared, vast investments have doubtless been made throughout the state in street-lighting equipment. Under the principle of *stare decisis,* a rule of law in the nature of a rule of property once established and acquiesced in without change by the legislature should be adhered to. A multitude of cases to that effect is cited in 2 Callaghan's Wis. Dig. p. 1448. Courts hesitate long before they overrule such decisions and disturb rights and interests, which have become vested thereunder. They will not overrule them except for compelling reasons.

3. The respondent contends that the rule of *stare decisis* should not be applied to the *Chilton Case* decision because, as is urged, the city of Chilton had no right to construct a plant to serve the inhabitants of the city; and that as the decision could have rested upon that proposition alone; it was not necessary to consider its right to construct a plant for municipal lighting and the decision is *obiter dicta.* But both questions were directly involved in the case. This court might as well have rested its decision alone upon the proposition that the existing utility had the exclusive right to do street lighting as that it had the exclusive right to serve the inhabitants of the city. As quoted from *Union Pacific R. Co. v. Mason City,* 199 U. S. 160, 166, 26 Sup. Ct. 19, in *Chase v. American Cartage Co.* 176 Wis. 235, 237, 186 N. W. 598:

"Where there are two grounds upon either of which the judgment of the trial court can be rested, and the appellate court sustains both, the ruling on neither is *obiter,* but each is the judgment of the court and of equal validity with the other."

Moreover, as stated in *Chase v. American Cartage Co., supra,* p. 238:

"When a court of last resort intentionally takes up, discusses and decides a question germane to, though not neces-

sarily decisive of, the controversy, such decision is not a *dictum*, but is a judicial act of the court which will thereafter be recognized as a binding decision."

This is no new doctrine. It has been the declared law of this state for fifty years. The precise point was considered and discussed at length in an opinion by Mr. Justice CASSODAY in *Buchner v. Chicago, M. & N. W. R. Co.* 60 Wis. 264, 19 N. W. 56, and position was taken as above stated. It was there declared that statements in an opinion of an appellate court upon points so involved in a case that it is the duty of counsel to argue them, which are deliberately passed upon by the court, are judicial *dictum* as distinguished from *obiter dictum,* and are as binding as if the decision hung upon a single point.

4. The respondent also urges that the part of the *Chilton* decision relating to municipal service is not entitled to weight because a year after the decision was rendered Mr. Justice KERWIN, in a concurring opinion filed in *McKinley Telephone Co. v. Cumberland Telephone Co.* 152 Wis. 359, 140 N. W. 38, a case not at all involving the proposition here at issue, characterized the statement of the court upon that subject as *dicta,* and stated that he wished to withdraw the acquiescence therein of himself and Mr. Justice TIMLIN, both of whom participated in the decision. It is to be observed that the learned justice did not use the term *obiter dicta.* He manifestly considered the *dicta* referred to as the judgment of the court and effective as such. That the learned justices changed their minds is perhaps interesting, but it does not affect the stability of the judgment of the court or cast any considerable reflection upon its soundness. Had the point come before the court again during the incumbency of these justices they might have changed their minds again.

5. The respondent contends that the legislature has so amended the utility law since the *Chilton* decision as to ren-

der that decision no longer applicable. We do not so regard the amendments referred to. The controlling statute when the decision was rendered was sec. 1797m—74, sub. 3, Stats. 1911, now numbered sec. 196.50 (4), Stats. 1933. So far as here material that statute then read as follows: "No municipality shall hereafter construct any such plant or equipment where there is in operation under an indeterminate permit . . . in such municipality a public utility engaged in similar service, without first securing" a certificate of convenience and necessity. Sec. 196.50 (4) now reads: "No municipality shall hereafter construct any . . . *public utility* when there is in operation," etc., as above stated.

It is contended that this language implies that only·the construction of a plant or equipment is prohibited which is to furnish electrical current to private consumers.

In the first place the phrase "public utility" in sec. 196.50 (4) is a misnomer; a public utility by sec. 196.01 (1) is a corporation or individual owning or operating the plant furnishing the public service unless the context requires otherwise. In the original statute it meant nothing but such an owner. The statute as it now reads manifestly was not intended to prohibit the "construction" of a "corporation or person," which would be its meaning if the words "public utility" were given the meaning originally given and now ordinarily given to them under the public utility law. We must therefore resort to construction to determine what the statute as it now stands means. In so doing we must bear in mind that the change of the statute was effected by a revisor's bill, enacted by ch. 504, Laws of 1929, and that in such bills there is no intent to change the meaning of the statutes revised; and the statute will not be construed as effecting a change in meaning, unless the language used is so clear and explicit as not to be subject to interpretation. If there is any ambiguity in the changed language, it will be interpreted to mean as in the statutes revised. *Oconto Com-*

*pany v. Town of Townsend,* 210. Wis. 85, 244 N. W. 761, 246 N. W. 410; *Kugler v. Milwaukee,* 208 Wis. 251, 242 N. W. 481. Under this rule the statute must be held to mean what it meant when the *Chilton Case* was decided.

As to this, we will further say that the insertion of the words "public utility" for "plant or equipment" in sec. 196.50 (4) is probably accounted for as follows: Ch. 48, Laws of 1911, made owners of toll-bridges public utilities. In Stats. 1911, to sec. 1797m—1, which defined the term "public utility," the words "or that now or hereafter may own, operate, manage or control any toll-bridge wholly within this state" were added. This statute to this point remained unchanged until and including Stats. 1927. In 1929 a revisor's bill was passed revising the utility law (ch. 504, Laws of 1929). The opening sentence of sec. 196.01 (1) was made to read: (1.) "As used in chapters 196 and 197, unless the context requires otherwise, 'public utility' means and embraces every . . . [owner of] any toll-bridge or any plant or equipment . . . [for furnishing] heat, light, water or power either directly or indirectly to or for the public."

By sub. (4) of sec. 196.01 the term "service" was declared to be used in its broadest sense, and by sub. (5) the indeterminate permit was declared to embrace every grant "of any public utility service," which would include the service rendered by toll-bridges. In this revisor's bill sec. 196.50 (4), which supplanted sub. (3) of sec. 196.01 in the Statutes of 1927, the words "public utility" supplanted the words "such plant or equipment" apparently because a toll-bridge does not properly fall within the meaning of "plant or equipment." A plant or equipment and a toll-bridge both fall within the term "public utility" construed as meaning the service performed by a public utility. This satisfactorily explains the use of the words "public utility" in sec. 196.50 (4). They cover a "plant or equipment"

when applied to electrical service and cover a "toll-bridge" when applied to the service performed by toll-bridges. We are not saying that the enactment of the revisor's bill gave to owners of toll-bridges an indeterminate permit. Such result would hardly be brought about by enactment of a revisor's bill unless such intent were expressly declared therein. Whether there is any other statute so providing we are not advised. Enactment of ch. 48, Laws of 1911, did not have that result, and such result could not be accomplished except by an act of the legislature expressly so declaring. *Muscoda Bridge Co. v. Muscoda*, 193 Wis. 457, 214 N. W. 435. We have merely meant to indicate what seems to us to explain the substitution of the words "public utility" for the words "plant or equipment" in the statute now directly under consideration.

Respondent also contends that chs. 183 and 475, Laws of 1931, by not making provisions therein expressly applicable to municipalities as well as public utilities, somehow indicate an intent that municipalities may do as here threatened. We are unable to perceive any such indication. Subs. (1) and (2) of sec. 196.49, as its terms are fixed by these chapters, contain the statements of the construction of the plants and equipment prohibited. Sub. (1) prohibits commencing construction by public utilities "in any municipality where there is *not* in operation under an indeterminate permit a public utility engaged in similar service." As the plaintiff is so operating in Beloit, this subsection does not apply. Sub. (2) provides that no public utility shall begin extensions of its plant without approval of the public service commission. This manifestly does not apply to the existing situation. Sub. (8) of sec. 66.06, Stats., is also referred to as indicating like intent. Pars. (a) to (c) of sub. (8) hark back to 1882. At the time the utility law was enacted they stood as secs. 926—126 to 926—129, Sanborn & Berryman's Supplement, which provided how cities of the third and fourth

classes should proceed to acquire waterworks and plants for electrical service. These statutes continued in practically the same form through the statutes to and including the Statutes of 1919. In 1921 they were by revisor's bill put in their present form as numbered above. The utility law as a later enactment rendered the provisions of these statutes inoperative so far as they conflicted with it. Their continuation in form as before the enactment of the utility law does not at all indicate a legislative intent as to the meaning of the provisions of that law. By its language the subsection applies to the construction and equipment within or without its borders of a plant furnishing heat, light, or power to a municipality or its inhabitants. Manifestly the construction by a municipality contemplated by the retaining of this statute is construction where there is no public utility operating in the municipality under an indeterminate permit. Else the statutory provisions protecting a public utility so operating are meaningless and never became effectual. In view of the legislative history of this statute it is idle to contend that a municipality may construct a plant to operate in competition with a public utility furnishing electrical service to its inhabitants. Under ch. 197, Stats., a municipality cannot engage in furnishing such service without procuring an existing public utility that is operating within it under an indeterminate permit or without first procuring from the public service commission a certificate of convenience and necessity. Such a public utility has a franchise not only to furnish electrical service to the inhabitants but to the municipality itself. We cannot by such far-fetched and fanciful speculations impute to the legislature an intention to confer upon a municipality the right to destroy the property of a public utility operating therein under an indeterminate permit, devoted to municipal purposes and to deprive it of its franchise to supply the municipality as well as its inhabitants

secured to it under the general provisions of that law as interpreted by this court over twenty years age. The law permits a city to take over in its entirety the plant of a public utility so operating therein if it desires to do so by following the statutory procedure therefor. But it does not permit a city to do so piecemeal by first destroying the property of the existing utility devoted to and. its franchise for municipal service and then, after it has by this means depreciated the value of its franchise for private service, take over that franchise and the plant and equipment .devoted to that serv-ice at its depreciated value, as it might do if the contentions of the defendant herein are sustained.

7. It is contended that the decision of this court in *Wis-consin Traction, L., H. & P. Co. v. Menasha,* 157 Wis. 1, 145 N. W. 231, expressly authorizes what is here attempted. This contention cannot be upheld. Prior to the enactment of the utility law the city of Menasha had in operation a plant for the lighting of its streets. This plant was in opera-tion at the time of the institution of the suit. The plaintiff corporation had a franchise to render electrical service to private persons. It had been operating under this franchise prior to the enactment of the utility law, but had not been in the field of street lighting. It had not voluntarily surren-dered its franchise and accepted an indeterminate permit, but the 1911 Statute forced the indeterminate permit upon all public service corporations that had not theretofore volun-tarily accepted it. The city passed a resolution to issue $40,000 of bonds for the purpose of enlarging its plant for the purpose of doing commercial lighting. The plaintiff brought suit to enjoin it from so doing. The court held that the city could not enter the field of private lighting without procuring a certificate of convenience and necessity. It did not interfere with the existing. situation as to municipal lighting because that field was occupied by the city before

the enactment of the utilities law, and the plaintiff utility had never entered that field at all and had no franchise covering that field.

It is also contended that *Neacy v. Milwaukee,* 151 Wis. 504, 139 N. W. 409, is inconsistent with or inferentially overruled the *Chilton Case.* That action was brought by a taxpayer to enjoin the city from constructing and operating a municipal light and power-plant and using money and issuing bonds therefor on the ground of invasion of the public utility field without procuring a certificate of convenience and necessity. The city prior to the enactment of the public utility law had begun the construction and operation of a municipal power-plant. Bonds had been voted therefor and the issue had been declared void for reasons entirely apart from the utility law. However, the city had gone ahead and sold some of the bonds and commenced the construction of a plant. The bonds so sold had been validated by act of the legislature. The court said of the contentions of the city in that case (p. 511):

"The appellants [city officers] contend that it is not necessary to procure a certificate of convenience and necessity for three reasons: first, that it is not necessary where a . . . municipality intends to construct a plant and generate electricity for its corporate needs; second, the city having commenced construction of its plant before there was in existence in the city a plant operated under an indeterminate permit . . . ; and third, that since the passage of the utility law the legislature has expressly authorized the building of the plant without a certificate of convenience and necessity. The last two propositions, we think, control this case, and the *first need not* be considered."

Thus the proposition here at issue was not passed upon in either of the cases cited.

*Central Wisconsin P. Co. v. Wisconsin Traction, L., H. & P. Co.* 190 Wis. 557, 209 N. W. 755, is also cited to the same effect. Both parties in this suit were public utilities;

neither, however, had a franchise to furnish electrical serv-. ice within the city of Clintonville. The city itself held and was operating under an indeterminate permit to furnish such service. It is thus manifest that this case is not at all in point.

8. This we believe sufficiently covers all points raised by the respondent in defense of its proposed action, except the contention that as the law permits a private person or corporation in a municipality wherein there is a public utility operating under an indeterminate permit to furnish electrical service to himself or itself a municipality may do likewise.

To this it seems sufficient to say that municipalities do not necessarily have the same rights of property that individuals and private corporations have, or the same rights as to supplying electrical energy to its streets and public buildings that individuals and private corporations have to supply the needs of their property in that respect. A city is a creature of the state. It is the agent of the state. *Milwaukee v. Raulf,* 164 Wis. 172, 183, 159 N. W. 819. It has such powers as the state gives it. It has such property as the state permits it to acquire and such property rights as the state confers upon it. These rights may be modified or restricted as the state sees fit. Vested rights once given may not, perhaps, be taken away. At least the public utility law has been construed as not taking away from a municipality a right to maintain a municipal lighting plant where it was exercising such right prior to the enactment of that law. *Neacy v. Milwaukee, supra; Wisconsin Traction, L., H. & P. Co. v. Menasha, supra.* But the city of Beloit had no vested right to operate in the municipal field before the utilities law was enacted. As to cities which had not obtained such vested right, the state may restrict their rights to operate in that field as it sees fit. It has seen fit, as declared in the *Chilton Case,* to restrict their rights of operation in that field where an existing utility is so operating under an

indeterminate permit by requiring them to procure a certificate of convenience and necessity before they can so operate. If the existing utility does not provide adequate service, or does not provide service at reasonable rates, the city may apply to the public service commission for relief and procure it.

*By the Court.*—The order of the circuit court is reversed, with direction to. enter an order sustaining the demurrer and for further proceedings according to law.·

A motion for a rehearing was denied, without costs, on June 5, 1934.

For.the appellant there were briefs by *Schubring, Ryan & Petersen* of Madison, and oral argument by *William-Ryan.*

For ˙the respondents there was a brief by *Clarence L.·Haugan* of Beloit, attorney, and *Anan Raymond* and *Poppenhusen, Johnston, Thompson & Cole,* all of Chicago, of counsel, and oral argument by *Mr. Haugan*·and *Mr. Ray-mond.*

A brief was also filed by *Robert J. Cunningham* of Janesville, counsel for the League of Wisconsin Municipalities, as *amicus curiæ.*

