[No. C037270. Third Dist. Mar. 18, 2003.]

ALBERTSON'S, INC., Plaintiff, Cross-defendant and Respondent, v. JAMES YOUNG et al., Defendants, Cross-complainants and Appellants.

## COUNSEL

Gronemeier & Associates and Dale L. Gronemeier for Defendants, Cross-complainants and Appellants.

Kronick, Moskovitz, Tiedemann & Girard, Dorothy S. Landsberg and Robin Leslie Stewart for Plaintiff, Cross-defendant and Respondent.

## OPINION

**SCOTLAND, P. J.**—Over two decades ago, our state Supreme Court concluded that a privately owned shopping center that attracts large numbers

of people to congregate in order to shop and take advantage of other amenities offered by the shopping center is the functional equivalent of the traditional town center, which historically is a public forum where persons can exercise the right to free speech. (*Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899, 910-911 & fn. 5 [153 Cal.Rptr. 854, 592 P.2d 341] (hereafter *Pruneyard*).) Therefore, the Supreme Court held that the free speech clause of California's Constitution precluded the Pruneyard Shopping Center from preventing a small group of individuals from setting up a table within the center to peacefully distribute handbills and solicit signatures on petitions. (*Id.* at pp. 910-911.)

James Young, Eloise Voneckert, John Slevin, Charles Noble, Christopher Noble, and Edward Noonan (defendants) are individuals who solicit and gather signatures on initiative petitions to place measures on election ballots. Armed with initiative petitions and the holding in *Pruneyard*, defendants attempted to solicit the signatures of shoppers by stationing themselves on the walkway immediately outside of the entrances to a grocery store owned and operated by Albertson's, Inc., in Nevada County.

Albertson's forbade them from doing so, took steps to stop their activity, and then commenced this action for injunctive and declaratory relief. Defendants cross-complained, alleging that Albertson's violated their constitutional rights to free speech and caused them harm.

The trial court ruled that the Albertson's store is not the functional equivalent of a traditional public forum and, therefore, defendants do not have a constitutional right to use it to solicit signatures on initiative petitions. Accordingly, the court entered judgment in favor of Albertson's, permanently enjoining defendants from coming onto the premise of the store for voter registration activity or to solicit and gather signatures on petitions to governmental or political bodies.

On appeal, defendants contend the court failed to consider that Albertson's permitted other noncommercial expressive activity at the store, and erred in viewing it as a stand-alone store rather than as part of the shopping center in which it is located. And, they argue, even if Albertson's store is considered a stand-alone business, the plurality, concurring, and dissenting opinions of the California Supreme Court in *Golden Gateway Center v. Golden Gateway Tenants Assn.* (2001) 26 Cal.4th 1013 [111 Cal.Rptr.2d 336, 29 P.3d 797] (hereafter *Golden Gateway*) have, in the words of defendants' counsel, "delineated the reach of California's constitutional free speech provision in a manner which appears to extend the constitutional rights to stand-alone grocery stores."

We disagree with each of these contentions and shall affirm the judgment. As we will explain, *Golden Gateway* does not support defendants' position. The test that courts must apply is whether, considering the nature and circumstances of the private property, it has become the functional equivalent of a traditional public forum. Here, the nature and circumstances of the Albertson's store do not impress it with the character of a traditional public forum, nor do the setting and circumstances of the shopping center where it is located. And the fact that Albertson's has established content-neutral and nondiscriminatory rules and procedures by which expressive activity may be permitted on the store's premises does not impress it with the character of a traditional public forum.

## FACTS

The parties' evidence established that the following facts existed at the time this dispute arose.

Albertson's store is located in Fowler Center, a shopping center between Grass Valley and Nevada City. The entire shopping center covers about 14 acres, comprised of seven separate parcels. The center has a total building area of 126,448 square feet and contains approximately 650 parking spaces.

Fowler Center is not a mall, and it does not contain any courtyards, plazas, picnic areas, gardens, educational facilities, health clubs, or gyms. All of the businesses are accessed from the large parking lot. The parking area and sidewalks in the center are available for the common use of the property owners, tenants, and customers for movement among the businesses at the center.

A declaration of restrictions and grant of easements mutually executed by owners of the parcels covered by the shopping center limits the uses of the common areas and provides that there will be no open or enclosed mall at the center unless Albertson's gives written consent thereto. The declaration of restrictions also prohibits certain types of businesses, such as theaters, bowling alleys, skating rinks, gyms, health spas, and pool halls, from being located in the center.

Albertson's representative explained that a mall setting is not conducive to the type of customer Albertson's tries to attract, and any type of business that would encourage people to congregate in or to otherwise remain at the center for longer time periods would be contrary to Albertson's marketing plan. This is because Albertson's does business as a convenience store with a goal of getting customers in and out of the store very quickly.

Albertson's, on parcel 2, is one of two "anchor" stores in Fowler Center; the other, on parcel 4, is B & C True Value Hardware, with about 37,000 square feet of interior space and 60,000 square feet of outside storage. The remaining five parcels in the center contain 10 retail stores, five restaurants or food retailers, and five service businesses, including a travel agency, photo store, video library, and mail box rental.

Albertson's privately owned parcel consists of about three and one-half acres, and includes the grocery store, the walkway in front which is the sole means of ingress and egress to the store, and a portion of a large parking lot directly in front. Within a radius of 200 feet of the store, there are about 189 parking spaces. The interior of the store contains 44,237 square feet, of which approximately 35,000 square feet are devoted to sales space and approximately 10,000 square feet are back room areas. Albertson's has exclusive control over its store area.

The store sells predominately food products and is a "typical supermarket." A breakdown of sales reflects that 75 percent of the purchases involve food merchandise and 25 percent are general merchandise. There are the standard food sections, such as frozen foods, service deli, bakery, produce, pet food, meat and seafood, dairy, and liquor; and the store contains a video rental section, a Tri Counties Bank, a plants and flower section, photo processing, health and beauty aids, cigarettes and tobacco, magazines and paperback books, a copy machine, and the rental of steam cleaning machines.

There are no areas in the store for people to congregate or to sit and eat and converse. There are no coffee bars and no public meeting areas. Albertson's considers the interior space to be too valuable to use for things other than sales.

The record establishes that the primary reason customers visit the store is to buy groceries. The general public is invited to shop there. Albertson's uses weekly newspaper advertising to encourage customers to shop at the store, but does not advertise in conjunction with any other retail establishment in Fowler Center.

Albertson's marketing objective is to give people easy access in and out of the store, which is designed for safe and efficient access. Customers can park directly in front of the store, and the store entrances are right next to the parking area. There is an express checkout stand to help customers get in and out quickly.

The walkway in front of Albertson's is just over six feet wide and 138 feet long. At either end of the walkway are entrance and exit doors. Directly in

front of each set of doors, there are alcove areas of approximately 490 to 684 square feet in addition to the walkway area. The alcoves contain the grocery cart holding areas, water and soda dispenser machines, trash cans, a postal service mailbox, courtesy benches for customers, pay phones, and a bulletin board to display Albertson's weekly newspaper ads. On the front walkway, small propane tanks are available for sale. A recycling center, required by law, is located in the rear of the parking lot.

Albertson's infrequently offers items for sale on the sidewalk in front of the store, such as plants in the spring. In the past, two or three "truckload" seafood sales were held in the parking lot. At Christmas time, the store conducts a promotional photo shoot with Santa Claus to induce customers to return to the store to pick up photographs. Pursuant to company policy, the store can permit noncommercial expressive activity on the walkway portion of its premises in accordance with corporate time, place, and manner rules.

The Albertson's store experiences an average of 15,000 to 20,000 customers on a weekly basis. General market statistics reflect that some customers make several shopping trips per week. The store has under a 10 percent share of the local grocery store market, behind Safeway and Lucky's.

Nevada County, including the town of Truckee on the eastern side, had a population of 90,474 and Grass Valley had a population of 9,186. No population figures were provided for Nevada City or for the rural areas of the county west of the Donner Summit. There was no definitive evidence provided on the radius or area from which Albertson's customers were drawn or their driving distances. There was no evidence with respect to the number of patrons who visit Fowler Center itself or the hardware store at the center.

An expert for Albertson's identified a total of six retail shopping centers in the Grass Valley area. Three had building areas larger than Fowler Center, these being the Gold Country Center, Kmart/SPD Market, and the Raley's Center. The expert described the Grass Valley downtown as " 'healthy' with a wide range of businesses, and quite a bit of pedestrian as well as auto traffic."

Of the six retail shopping centers in the area, defendants rated Fowler Center as the most suitable for signature gathering, primarily based on traffic flow and the presence of both Albertson's and the hardware store. Of the other centers, only Raley's was considered nearly as good for their purposes. Defendants do not regard community events as a good location for signature gathering. And they consider the downtown areas of Nevada City and Grass

Valley to be poor locations based on the volume of people on the streets, the potential for nonresident tourist visitors, and traffic volume.

Defendants attempted to solicit the signatures of shoppers by stationing themselves on the walkway immediately outside of the entrances to Albertson's grocery store.

DISCUSSION

I

Defendants contend that, in accordance with the reasoning of *Pruneyard, supra,* 23 Cal.3d 899, the privately owned walkway in front of Albertson's grocery store is a public forum for defendants' signature-gathering activity because the store is part of a large shopping center.

In the alternative, defendants argue that, even if Albertson's store is viewed as a stand-alone business, the Supreme Court's relatively recent decision in *Golden Gateway, supra,* 26 Cal.4th 1013 "indicates that stand-alone retail stores which are not modest retail establishments are constitutionally-protected forums for the exercise of non-commercial expressive activities in California."

For reasons that follow, we are not persuaded by either of these contentions.

A. *Pruneyard*

The privately owned shopping center in *Pruneyard* was located on approximately 21 acres, five acres of which were devoted to parking. (*Pruneyard, supra,* 23 Cal.3d at p. 902.) The other 16 acres of the center contained walkways, plazas, a central courtyard, and various businesses, including 65 retail shops, 10 restaurants, and a cinema. (*Ibid.*) The plaintiffs were high school students who were opposed to a United Nations resolution and who set up a table in a corner of the central courtyard of the shopping center and sought to discuss their concerns with shoppers and solicit signatures for a petition to be sent to the White House. (*Ibid.*) When the students were excluded from the shopping center, they brought an action to enjoin the owners of the center from denying them access to circulate their petition. (*Id.* at p. 903.)

*Pruneyard* recognized that the federal Constitution does not give individuals a general right of access to private property for free speech purposes.

(*Pruneyard, supra*, 23 Cal.3d at pp. 904-905; *Hudgens v. NLRB* (1976) 424 U.S. 507, 518-521 [96 S.Ct. 1029, 1035-1037, 47 L.Ed.2d 196, 206-207]; *Lloyd Corp. v. Tanner* (1972) 407 U.S. 551, 567-570 [92 S.Ct. 2219, 2228-2229, 33 L.Ed.2d 131, 141-143].) Nevertheless, *Pruneyard* concluded that federally protected property rights would "not preclude law-making in California which requires that shopping center owners permit expressive activity on their property. To hold otherwise would flout the whole development of law regarding states' power to regulate uses of property and would place a state's interest in strengthening First Amendment rights in an inferior rather than a preferred position." (23 Cal.3d at pp. 905-906.) In this regard, *Pruneyard* stated: "To protect free speech and petitioning is a goal that surely matches the protecting of health and safety, the environment, aesthetics, property values and other societal goals that have been held to justify reasonable restrictions on private property rights." (*Id.* at p. 908.)

*Pruneyard* then turned to the question of whether California's Constitution creates broader speech rights with respect to private property than does the federal Constitution. (*Pruneyard, supra*, 23 Cal.3d at pp. 903, 908.) After noting the importance of free speech and the right to petition the government, and observing that "central business districts apparently have continued to yield their functions more and more to suburban centers" (*id.* at p. 907), the court held that "sections 2 and 3 of article I of the California Constitution protect speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." (*Id.* at p. 910.)

Quoting Justice Mosk's dissent in *Diamond v. Bland* (1974) 11 Cal.3d 331, 345 [113 Cal.Rptr. 468, 521 P.2d 460], *Pruneyard* stated: " 'It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment. As a result of advertising and the lure of a congenial environment, 25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered by the [shopping center there]. A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations [citation] would not markedly dilute defendant's property rights.' [Citation.]" (*Pruneyard, supra*, 23 Cal.3d at pp. 910-911.)

Thus, central to the holding in *Pruneyard* is its recognition that urban business districts arrayed along public streets have yielded some of their historic functions to suburban shopping malls located on private property. (*Pruneyard, supra*, 23 Cal.3d at pp. 907, 910, fn. 5.) In particular, the *Pruneyard* holding is premised upon its finding that large retail shopping

centers now serve as the functional equivalent of the traditional town center business district, where historically the public's free speech activity is exercised. (*Id.* at pp. 907-910 & fn. 5.)

Taken as a whole, *Pruneyard* implies that smaller privately owned commercial establishments that do not assume the societal role of a town center may prohibit expressive activity unrelated to the business enterprise. (*Planned Parenthood v. Wilson* (1991) 234 Cal.App.3d 1662, 1670 [286 Cal.Rptr. 427].)

*Pruneyard* was affirmed by the United States Supreme Court in *Pruneyard Shopping Center v. Robins* (1980) 447 U.S. 74 [100 S.Ct. 2035, 64 L.Ed.2d 741], which rejected the contention that it impermissibly infringed upon the property owner's federally protected property rights or his own First Amendment rights. (*Id.* at pp. 82-88 [100 S.Ct. at pp. 2041-2044, 64 L.Ed.2d at pp. 752-756].) In holding that a shopping center may be required by the state to allow individuals to use the property for free expression and petition, the majority noted that nothing suggested "this sort of activity will unreasonably impair the value or use of [the] property as a shopping center." (*Id.* at p. 83 [100 S.Ct. at p. 2042, 64 L.Ed.2d at p. 753].) In this regard, the majority emphasized that the shopping center "is a large commercial complex that covers several city blocks, contains numerous separate business establishments, and is open to the public at large," that the California Supreme Court's ruling allows the shopping center to "restrict expressive activity by adopting time, place, and manner regulations that will minimize any interference with its commercial functions," and that the students "were orderly, and they limited their activity to the common areas of the shopping center." (*Id.* at pp. 83-84 [100 S.Ct. at p. 2042, 64 L.Ed.2d at p. 753].)

Justice Marshall concurred, stating that while there remains a federal constitutional barrier to the abrogation of common law property rights, this barrier is not "approached" by a decision "limited to shopping centers, which are already open to the general public." (*Pruneyard Shopping Center v. Robins, supra*, 447 U.S. at pp. 94-95 [100 S.Ct. at p. 2037, 64 L.Ed.2d at p. 760] (conc. opn. of Marshall, J.).)

Justice Powell, joined by Justice White, also concurred because the decision "is limited to the type of shopping center involved in this case." (*Pruneyard Shopping Center v. Robins, supra*, 447 U.S. at p. 96 [100 S. Ct. at p. 2048, 64 L.Ed.2d at p. 761] (conc. opn. of Powell, J.).) However, he warned: "Significantly different questions would be presented if a State authorized strangers to picket or distribute leaflets in privately owned, freestanding stores and commercial premises. Nor does our decision today

apply to all 'shopping centers.' This generic term may include retail establishments that vary widely in size, location, and other relevant characteristics. Even large establishments may be able to show that the number or type of persons wishing to speak on their premises would create a substantial annoyance to customers that could be eliminated only by elaborate, expensive, and possibly unenforceable time, place, and manner restrictions." (*Id.* at p. 96 [100 S.Ct. at pp. 2048-2049, 64 L.Ed.2d pp. 761-762].)

And Justice White wrote separately to emphasize that the California Supreme Court's decision dealt only with "the public or common areas in a large shopping center and not with an individual retail establishment within or without the shopping center . . . ." (*Pruneyard Shopping Center v. Robins, supra*, 447 U.S. at p. 95 [100 S. Ct. at p. 2048, 64 L.Ed.2d at p. 761] (conc. opn. of White, J.).)

B.  *Golden Gateway*

Over 20 years after its *Pruneyard* decision, the California Supreme Court acknowledged that the decision has been difficult to construe and apply. (*Golden Gateway, supra,* 26 Cal.4th at p. 1016.) Therefore, the court sought to "clarify" the holding. (*Ibid.*)

At issue in *Golden Gateway* was whether the owner of a large, privately owned residential apartment complex could prohibit a tenants association from distributing newsletters by leaving them on or under apartment doors. (*Golden Gateway, supra,* 26 Cal.4th at pp. 1016, 1017-1018.) The lead opinion, endorsed by three justices, concluded that California's constitutional free speech provision includes a "state action" requirement, i.e., it guards against infringement on speech by the government, but not by private parties. (*Id.* at pp. 1023, 1025, 1031 (lead opn. of Brown, J.).)

According to the lead opinion, the actions of the Pruneyard Shopping Center to exclude expressive activity could be considered "state action" for the purposes of California's free speech clause because of "the public character of the property." (*Golden Gateway, supra,* 26 Cal.4th at pp. 1032, 1033.) Due to its "open and unrestricted invitation to the public to congregate freely" within the property, the shopping center had become "the functional equivalence of . . . a traditional public forum—the ' " 'downtown[]' " ' or 'central business district[].' " (*Id.* at p. 1032.) This impressed the shopping center with a "public . . . character" that warranted "treat[ing it] as publicly owned property for First Amendment purposes . . . ." (*Id.* at p. 1033.)

The lead opinion went on to express a "threshold requirement for establishing state action," i.e., "the actions of a private property owner constitute

state action for purposes of California's free speech clause only if the property is freely and openly accessible to the public." (*Golden Gateway, supra,* 26 Cal.4th at p. 1033.)

Noting that access to the privately owned Golden Gateway apartment complex was limited to the tenants and their invitees, the lead opinion found that, unlike the Pruneyard Shopping Center, the apartment complex was "not the functional equivalent of a traditional public forum. Accordingly, Golden Gateway's actions [to preclude distribution of a tenant association newsletter] do not constitute state action . . . , and the Tenants Association has no right to distribute its newsletter [on the property]." (*Golden Gateway, supra,* 26 Cal.4th at pp. 1033-1034.)

The concurring opinion agreed with the result, concluding that constitutional free speech guarantees do not extend to the unsolicited distribution of pamphlets in the interior hallways of an apartment building that is not generally open to the public. (*Golden Gateway, supra,* 26 Cal.4th at p. 1036.) Hence, the "state action doctrine is irrelevant to this case" and need not be addressed. (*Id.* at pp. 1040, 1043 (conc. opn. of George, C. J.).)

The dissenting opinion, endorsed by three justices, rejected the concept of a state action requirement and concluded the issue must be resolved by balancing the competing interests involved. (*Golden Gateway, supra,* 26 Cal.4th at p. 1049 (dis. opn. of Werdegar. J.).) Because the tenants association was made up of "lawful members of a community occupying units of the property as their residences," to whom the property owner "already has surrendered" the hallways and other common areas in the complex "for virtually the entire range of activities and uses associated with daily living" (*id.* at p. 1059), the dissent believed that the "leafleting ban" should not be upheld because it "goes much further than is necessary to address any legitimate concerns [that apartment complex owner] may have about tenant safety, tenant privacy, or cleanliness of the premises." (*Id.* at p. 1060.)

From the opinions in *Golden Gateway,* defendants glean that the "decisive" criterion for determining whether private property constitutes a public forum for the purpose of expressive activity is whether "the property is freely and openly accessible to the public." Because Albertson's grocery store "is open to the public," defendants claim the plurality and concurring opinions "indicate[] that it is a site where members of the general public can exercise their constitutional non-commercial expressive activity rights."

This is merely wishful thinking. Nothing in *Golden Gateway* can be interpreted to support the conclusion that any large business establishment is

a public forum for expressive activity simply because it is "freely and openly accessible to the public." The quoted language simply is the test set forth by three members of the Supreme Court as a "threshold requirement" for establishing that actions of a private property owner constitute state action for purposes of California's free speech clause. (*Golden Gateway, supra,* 26 Cal.4th at p. 1033.)

Rather, the test appears to remain whether, considering the nature and circumstances of the private property, it has become the "functional equivalent of a traditional public forum." (*Golden Gateway, supra,* 26 Cal.4th at p. 1033 (lead opn. of Brown, J.); see *id.* at p. 1039 (conc. opn. of George, C. J.).)

*Golden Gateway* provides no help in resolving the dispute before us because (1) the Supreme Court was unable to reach a majority opinion in that case, (2) whether there is a state action requirement was not raised here,[1] and (3) the facts in *Golden Gateway* are not comparable to those regarding Albertson's store—among other things, *Golden Gateway* involved communication directly related to the use of the apartment complex, whereas the communication here was noncommercial activity unrelated to Albertson's business enterprise; and unlike the broader access to the Albertson's store, access to the apartment complex was limited to the tenants and their invitees.

Defendants' suggestion that we may receive further guidance from the Supreme Court through the resolution of two other cases (*Waremart, Inc. v. Progressive Campaigns, Inc.* (2002) 85 Cal.App.4th 679 [102 Cal.Rptr.2d 392], review granted Mar. 14, 2001, S094236; *Young v. Raley's, Inc.* (2001) 89 Cal.App.4th 476 [107 Cal.Rptr.2d 172], review granted Aug. 15, 2001, S098428), has gone for naught because on April 17, 2002, the court dismissed review in those cases.

Hence, we proceed to resolve the issue by reference to the *Pruneyard* opinion and published appellate decisions applying it.

## C. *Pruneyard progeny*

Appellate decisions applying *Pruneyard* focus on whether the property owner has so opened up his or her property for public use as to make it the functional equivalent of a traditional public forum. (E.g., *Trader Joe's Co. v. Progressive Campaigns, Inc.* (1999) 73 Cal.App.4th 425, 433-434 [86 Cal.Rptr.2d 442] (hereafter *Trader Joe's*); *Bank of Stockton v. Church of*

---

[1]Because the parties did not raise the question of whether there is a state action requirement, we do not address that issue, as our colleague has done in his concurring and dissenting opinion.

*Soldiers* (1996) 44 Cal.App.4th 1623, 1630 [52 Cal.Rptr.2d 429]; *Allred v. Harris* (1993) 14 Cal.App.4th 1386, 1390-1391 [18 Cal.Rptr.2d 530]; *Planned Parenthood v. Wilson, supra,* 234 Cal.App.3d at pp. 1671-1672; *Allred v. Shawley* (1991) 232 Cal.App.3d 1489, 1501-1502 [284 Cal.Rptr. 140].) The less that an owner has opened up the property for use by the general public, the less that the owner's rights are circumscribed by the statutory and constitutional rights of those who use it. (*Schwartz-Torrance Investment Corp. v. Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766, 771 [40 Cal.Rptr. 233, 394 P.2d 921]; accord, *Allred v. Shawley, supra,* 232 Cal.App.3d at p. 1502.)

■    Whether private property is to be considered quasi-public property subject to the exercise of constitutional rights of free speech and assembly depends in part on the nature, purpose, and primary use of the property; the extent and nature of the public invitation to use the property; and the relationship between the ideas sought to be presented and the purpose of the property's occupants. (*Planned Parenthood v. Wilson, supra,* 234 Cal.App.3d at p. 1671; *Allred v. Shawley, supra,* 232 Cal.App.3d at p. 1501; 73 Ops.Cal.Atty.Gen. 213, 222-223 (1990).)

As pointed out in *Trader Joe's, supra,* 73 Cal.App.4th 425, "*Pruneyard* instructs us to balance the competing interests of the property owner and of the society with respect to the particular property or type of property at issue to determine whether there is a state constitutional right to engage in the challenged activity." (*Trader Joe's, supra,* at p. 433.) *Pruneyard* did not hold that free speech and petitioning activity can be exercised only at large shopping centers or that such activities can be exercised on any property except for individual residences and modest retail establishments. (*Ibid.*) The size of the business is simply a factor to be weighed in balancing the competing interest of the owner and society—"[t]he smaller the business, the more weight the owners' rights will have." (*Allred v. Shawley, supra,* 232 Cal.App.3d at p. 1496.)

*Trader Joe's* applied the aforementioned balancing test and concluded that the societal interest in using a Trader Joe's store in Santa Rosa as a forum for exercising free speech and petitioning activities did not outweigh Trader Joe's interest in exercising exclusive control over the use of its private property. (*Trader Joe's, supra,* 73 Cal.App.4th at p. 434.) The particular store in question was a specialty retail store, offering unique grocery items, located in an 11,000-square-foot building with a parking lot containing 68 spaces. (*Id.* at pp. 428-429.) Unlike the Pruneyard Shopping Center, Trader Joe's was a single structure, single-use store, containing no plazas, walkways, or central courtyards for patrons to congregate and spend time together. The store sold food but had no restaurant or any place for patrons to

sit and eat. It did not have a cinema or any other form of entertainment. Although the store attracted a large number of persons, they came for a single purpose, to buy goods. The store did not invite the public to meet friends,· to eat, to rest, to congregate, or to be entertained at its premises. Thus, the store's interest in maintaining exclusive control over its private property was stronger than the interest of a shopping mall owner. (*Id.* at p. 433.)

*Trader Joe's* noted that "because the store is a stand-alone structure, there can be no contention that its relationship to other establishments transforms it into a public forum. In short, the Santa Rosa Trader Joe's is not a public meeting place and society has no special interest in using it as such." (*Trader Joe's, supra,* 73 Cal.App.4th at p. 433.) "Both federal and state courts have recognized that property does not 'lose its private character merely because the public is generally invited to use it for designated purposes. Few would argue that a free-standing store, with abutting parking space for customers, assumes significant public attributes merely because the public is invited to shop there.' . . . Trader Joe's opens its property to the public so the public can buy goods. It does not offer its property for any other use. Thus, in contrast to Pruneyard and other multipurpose shopping centers, the Santa Rosa Trader Joe's does not have a 'public character.' . . ." (*Id.* at p. 434, citations omitted.)

D.   *Albertson's grocery store*

Decisional authorities indicate that, in considering whether a particular business or business area is impressed with a public character for purposes of expressive activity, no single factor is determinative. ■■■ When we consider Albertson's store in light of all the surrounding circumstances, we are satisfied the trial court correctly concluded that it is not the functional equivalent of a traditional public forum.

First, we consider the nature of the Albertson's store, which is a single structure, single-use grocery store, that contains no plazas, walkways, or courtyards for patrons to congregate and spend time together. It sells food but has no restaurant or any place for patrons to sit and eat, other than a courtesy bench for such things as waiting for a taxi. It does not have a theater or any other form of entertainment. Although the store attracts a large number of customers, they come for a single purpose, to buy goods. The store does not invite the public to meet friends, to eat, to rest, to congregate, or to be entertained at its premises.

For their part, defendants demonstrated that they would like to set up at the entrance to the Albertson's store because of the many shoppers there.

However, to establish a quasi-public forum at a particular store, it is not enough that a large number of people visit the store. A location will be considered a quasi-public forum only when it is the functional equivalent of a traditional public forum as a place where people choose to come and meet and talk and spend time. (*Pruneyard, supra,* 23 Cal.3d at pp. 907, 910, fn. 5; *Trader Joe's, supra,* 73 Cal.App.4th at p. 434.) The evidence does not establish that the Albertson's store is such a place.

Next, we consider whether its location in Fowler Center impresses the Albertson's grocery store with the character of a public forum. Among other things, we consider the physical layout of the center, which includes seven separate buildings situated around the perimeter of a central parking lot.

Albertson's store and the B & C True Value Hardware store are fairly large retail establishments housed in their own separate buildings. The other buildings, and the businesses they house, are relatively small and consist of 10 retail stores, five restaurants or food retailers, and five service businesses (including a travel agency, photo store, video library, and mail box rental).

Albertson's store, in building 2, is located on the north side of the parking lot. The much smaller building 1 is located to the east of Albertson's, and the much smaller building 3 is located to the west of Albertson's. To the west of building 3 is the hardware store's large outside storage area, which is not a common area. The hardware store, in building 4, is to the southwest and across the parking lot from Albertson's. Buildings 5, 6, and 7, are south and across the parking lot from Albertson's.

All of the buildings in Fowler Center, and all of the businesses they house, are supplied with sufficient, immediately contiguous parking spaces so that anyone wishing to patronize a particular business would generally have no need, and no occasion, to walk past any other business.

There are no enclosed walkways, plazas, courtyards, picnic areas, gardens, or other areas that might invite the public to congregate at Fowler Center. And the center is not under unified ownership; it consists of seven parcels of land, with two parcels owned and occupied by Albertson's and the remaining parcels owned by members of the Fowler family. The property owners have entered into restrictive covenants to preclude the establishment of certain kinds of businesses, such as a bar, entertainment or recreational facility, training center, or educational facility, and the like. A representative of Albertson's explained that Albertson's endeavors to do business as a convenience store and that its premises are designed to get customers in and out very quickly. Any type of business that would encourage members of the

public to congregate or to remain on the premises for longer periods would be incompatible with Albertson's marketing plan.[2]

In view of the physical layout of Fowler Center, the restrictions on the types of businesses that may open in the center, and the absence of any common areas that would invite the public to meet, congregate, or engage in other activities typical of a public forum, we conclude that Albertson's location in Fowler Center does not impress the walkways of Albertson's store with the character of a traditional public forum. It is obvious that, by setting up at the entrances to the grocery store, defendants target Albertson's customers rather than the patrons of Fowler Center in general. In fact, as the trial court noted, defendants' evidence focused on Albertson's, and they did not present evidence with respect to the number of persons who visit Fowler Center itself or with respect to the number of persons who might visit more than one retail establishment in the course of a shopping trip.

Under the circumstances presented here, we are satisfied that its location in Fowler Center does little, if anything, to distinguish the Albertson's store from an ordinary stand-alone grocery store.

Defendants disagree, claiming the reasoning of *Pruneyard* demonstrates that Fowler Center is a public forum and that, because of Albertson's location in the center, the grocery store must be considered a public forum as well. The argument is a leap in logic from the *Pruneyard* decision.

*Pruneyard* involved an effort to solicit initiative signatures in the central courtyard of a large shopping center. Similarly, *Savage v. Trammell Crow Co.* (1990) 223 Cal.App.3d 1562 [273 Cal.Rptr. 302], the other decision on which defendants place substantial reliance, involved an attempt to engage in expressive activity in the common parking lot of a large shopping center. (*Id.* at p. 1581, fn. 7.) Neither case involved the claim of a right to set up and solicit signatures at the entrance to a particular individual business.

To establish a right to solicit signatures at the entrance to a specific store, it must be shown that the particular location is impressed with the character of a traditional public forum for purposes of free speech. For reasons stated above, the walkway at the entrance to Albertson's grocery store in Fowler Center is not such a public forum.

II

Defendants suggest that, even if Albertson's grocery store is considered apart from Fowler Center, *In re Lane* (1969) 71 Cal.2d 872 [79 Cal.Rptr.

---

[2]Some types of business, such as adult book stores, massage parlors, and bars, are excluded for the additional reason that Albertson's believes its customers would consider them obnoxious and would prefer not to shop near such businesses.

729, 457 P.2d 561] dictates the store be considered a public forum. In that case, our state Supreme Court set aside a conviction for trespassing based on a union official coming onto the privately owned sidewalk of a grocery store to distribute handbills urging customers not to patronize the store because it advertised in newspapers involved in a labor dispute. (*Id.* at p. 873.)

*In re Lane* is inapposite for two reasons. First, it was based on the federal Constitution and federal precedent. To the extent *In re Lane* could be read to suggest that private property is open for First Amendment activity simply because the public is invited to shop there, it is no longer viable in light of *Lloyd Corp. v. Tanner, supra*, 407 U.S. 551 [33 L.Ed.2d 131]. Second, *In re Lane* involved expressive activity specifically related to the business use of the property. That is a matter of distinctive significance, even under federal constitutional law, which does not recognize a general right to use private property for expressive purposes. (*Lloyd Corp. v. Tanner, supra*, 407 U.S. at p. 563 [92 S.Ct. at p. 2226, 33 L.Ed.2d at p. 140].) The significance of that factor to the *In re Lane* decision is indicated by its observation that the market should not be allowed to immunize itself against on-the-spot public criticism. (*In re Lane, supra*, 71 Cal.2d at p. 876.)

Defendants contend that *In re Lane* expresses independent state constitutional principles because it was cited in both *Pruneyard, supra*, 23 Cal.3d at pages 908 and 909, and *Golden Gateway, supra*, 26 Cal.4th at page 1032, footnote 12 (lead opn. of Brown, J.) and page 1038 (conc. opn. of George, C. J.). However, we are not aware of any legal principle by which a court, years after rendering a decision, can retroactively alter its ratio decidendi. *In re Lane* was not based on the state Constitution, and it did not involve expressive activity wholly unrelated to the business use of the property at issue. If our state Supreme Court intends to adopt the reasoning of *In re Lane* for purposes of our state Constitution, and to extend that reasoning to expressive activity unrelated to the business use of the property, it would be a simple matter to so state in clear and unambiguous language.

We are satisfied *In re Lane* simply stands for the proposition that private property rights in a store open to the public are not absolute but are subject to a balancing process in determining the right of access. (*Union of Needletrades, etc. Employees v. Superior Court* (1997) 56 Cal.App.4th 996, 1010, fn. 4 [65 Cal.Rptr.2d 838].) The fact the expressive activity was specifically related to the business use of the property in that case tipped the balance in favor of expressive access. (*Allred v. Shawley, supra*, 232 Cal.App.3d at p. 1504.) Thus, we agree with *Trader Joe's, supra*, 73 Cal.App.4th at page 436, that *In re Lane* is not controlling in the situation considered here.

## III

Defendants also rely on dictum in *Bank of Stockton v. Church of Soldiers, supra,* 44 Cal.App.4th 1623 (hereafter *Bank of Stockton*) to support their argument that a stand-alone grocery store like Albertson's is a public forum.

In *Bank of Stockton,* we were called on to decide whether it was an abuse of discretion to grant a preliminary injunction preventing a religious organization from soliciting donations from bank customers on the bank's premises. (*Bank of Stockton, supra,* 44 Cal.App.4th at p. 1625.) We upheld the preliminary injunction on the ground that the bank was not the equivalent of a public forum since it was a modest business establishment that did not provide a place for the general public to congregate and take advantage of the bank's amenities, and because the religious organization's solicitation was unrelated to the bank's activities. (*Id.* at pp. 1629-1631.)

In passing, *Bank of Stockton* stated: "Whatever 'modest retail establishment' means, it does not include a large shopping center and, in light of *In re Lane, supra,* 71 Cal.2d 872, decided before [*Pruneyard*] but relied on in [*Pruneyard*], *it also does not include a 'large "super-market-type" grocery store.'* " (*Bank of Stockton, supra,* 44 Cal.App.4th at p. 1630, italics added, citing *Pruneyard, supra,* 23 Cal.3d at pp. 908-909.)

This apparent bright-line rule, i.e., that a modest retail establishment within the meaning of *Pruneyard* does not include a large supermarket-type grocery store (such as Albertson's), was pesky dictum because *Bank of Stockton* was not required to decide whether such a grocery store is the functional equivalent of a traditional public forum. Moreover, for reasons stated above, this dictum misinterprets *Pruneyard* and *In re Lane.*

Recognizing that attorneys are resourceful advocates who understandably will seize upon any language, including dictum, favorable to their positions, we want to ensure that what we said in passing will now pass away, and not be used in the future. Hence, we back away from our erroneous dictum in *Bank of Stockton* and decline to follow it.

## IV

Defendants complain that, in its statement of decision, the trial court found that whether Fowler Center may be considered a quasi-public forum was a question not before the court, and thus declined to address it.

The court proceeded correctly. In their cross-complaint, defendants did not name as cross-defendants any other property owner or any other business

owner associated with Fowler Center. It would have been inappropriate for the court to adjudicate the rights of parties who were not before the court.

However, defendants assert that, by not determining whether Fowler Center itself is a public forum, the court essentially ignored Albertson's location there and considered the grocery store in isolation. We do not so read the statement of decision. Rather, the court considered the location of Albertson's in Fowler Center but concluded, as we do, that the location did not impress Albertson's with the character of a traditional public forum. Among other things, the court noted defendants did not present evidence of the number of customers who visit Fowler Center, as opposed to Albertson's, or the number of customers who visit more than one retail establishment in the course of a shopping trip. The court also rejected the view that Albertson's mere proximity to the B & C True Value hardware store impressed Albertson's with the character of a traditional public forum.

## V

Noting Albertson's does permit some noncommercial expressive activity to occur on the premises of its grocery store, defendants assert that this precludes Albertson's from excluding defendants.

The record shows Albertson's has a corporate policy that endeavors to accommodate persons or groups who wish to engage in petitioning and leafleting activity to the extent consistent with the primary commercial purposes of the supermarket. To that end, Albertson's has created written rules to govern the use of its property and the behavior of those who wish to engage in expressive activity. Among other things, the rules require an application for permission be submitted to the store director at least three days, but not more than 20 days, before the desired date of activity. And the rules provide that, in assigning the areas and times for political petitioning, the store director may not consider the content of the speech to be exercised.

Defendants argue that, because Albertson's will tolerate expressive behavior under some circumstances, its property thereby becomes a public forum from which it cannot exclude any expressive behavior. This is not the rule. (*Perry Ed. Assn. v. Perry Local Educations' Assn.* (1983) 460 U.S. 37, 46 [103 S.Ct. 948, 955-956, 74 L.Ed.2d 794, 805]; *Leeb v. DeLong* (1988) 198 Cal.App.3d 47, 56 [243 Cal.Rptr. 494]; *Gebert v. Patterson* (1986) 186 Cal.App.3d 868, 874 [231 Cal.Rptr. 150].)

Were defendants' argument to prevail, newspaper publishers would be required to print anything any member of the public desired to publish, and

homeowners who post political signs in their yards would be required to allow anyone who desired to post additional signs to do so.

And the establishment of the rule urged by defendants would likely prove to be more detrimental to, than promotive of, speech and petitioning activity. Under defendants' standard, the owner of private property that is not otherwise a quasi-public forum, who wished to retain primary control over the property, would have no choice but to prohibit all expressive activity on the property. Where, as here, a property owner endeavors to be a "good citizen" by agreeing to permit, on a content-neutral and nondiscriminatory basis, expressive activity to the extent consistent with the primary commercial use of the property, we should not lightly conclude that the owner thereby gives up the right to insist upon compliance with its rules.

The extent to which private property is actually used for expressive purposes by members of the public is relevant, together with all of the surrounding circumstances, in determining whether the property has taken on the characteristics of a traditional public forum. But defendants did not establish that the premises of Albertson's store are actually used for expressive purposes to such an extent that they must be considered such a public forum.

Defendants' argument is based on *Laguna Publishing Co. v. Golden Rain Foundation* (1982) 131 Cal.App.3d 816 [182 Cal.Rptr. 813] (hereafter *Laguna Publishing*), which involved a large walled and gated residential community with only resident-approved access permitted. (*Id.* at pp. 820, 843, fn. 10.) Without authorization from residents, the governing association allowed access to the publisher of one giveaway newspaper for the unsolicited distribution of the paper, while denying access to the publisher of another substantially similar newspaper. (*Id.* at p. 820.) Noting the large nature of the community,[3] and basing its decision on discrimination, *Laguna Publishing* held that the association, at least without authorization from residents, could not give access to one newspaper but not the other. (*Laguna Publishing*, at p. 843.)

*Laguna Publishing* did not rule that the community became a public forum because one newspaper was given access. To the contrary, it said the association could exclude both newspapers. (*Laguna Publishing, supra,* 131 Cal.App.3d at p. 844.) It also said that, by giving access to the newspapers, the association did not thereby have to give access to persons such as

---

[3]The community in *Laguna Publishing* included 20,000 residents, occupied eight square miles, and had its own system of streets, security force, parks, recreational facilities, and a hybrid form of self-government. (*Laguna Publishing, supra,* 131 Cal.App.3d at p. 843, fn. 10.)

evangelists, political campaigners, assorted salespeople, signature solicitors, or any other uninvited persons of the like. (*Id.* at p. 845.) *Laguna Publishing* held only that, under the circumstances, the association could not discriminate between the two substantially similar newspapers. Lest there be any doubt of the nature of the case, the court said: "This is purely and simply a discrimination case with substantial economic consequences, and not one truly involving the resolution of the rights of free speech in conflict with the vested rights of private property." (*Id.* at pp. 847-848, fn. 14.)[4] Such is not the case here.

In sum, the mere fact that Albertson's has established reasonable time, place, and manner rules for use of its property for expressive activity does not give defendants a constitutional right to use its property in disregard of those very rules.

SUMMARY

For all the reasons stated above, we conclude the nature and circumstances of Albertson's grocery store do not impress it with the character of a traditional public forum for purposes of free expression. And, in light of the setting and circumstances of Fowler Center, Albertson's presence there does not impress its store with the character of such a public forum. We also conclude the fact that Albertson's has content-neutral and nondiscriminatory rules and procedures by which expressive activity may be permitted on the premises of its store does not in itself impress the store with the character of a traditional public forum.

Accordingly, defendants have no right to use the privately owned premises of the Albertson's store to solicit and gather signatures for initiative petitions or for other such expressive activity.

Our colleague agrees the judgment must be affirmed, albeit "on a narrow ground: appellants failed to prove that *this* Albertson's store had replaced the public downtowns of Nevada City and Grass Valley as a public forum." (Conc. & dis. opn., *post*, at p. 129.)

Lamenting that "government at all levels in California has increasingly become subject to the domination and control of monied special interests,

---

[4]Without expressing a view of the validity of the decision in *Laguna Publishing*, the lead opinion in *Golden Gateway* distinguished it by noting it was a discrimination rather than public forum case. (*Golden Gateway, supra*, 26 Cal.4th at p. 1035 (lead opn. of Brown, J.).) Likewise, the concurring opinion distinguished it as a discrimination case. (26 Cal.4th at pp. 1039 & 1040, fn. 5 (conc. opn of George, C. J.).) In *Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300, 328-329, footnote 30 [127 Cal.Rptr.2d 482, 58 P.3d 339], the court disapproved certain reasoning of the decision in *Laguna Publishing*. That reasoning related to a different issue than we consider here.

leaving the average citizen without an effective voice in government" (conc. & dis. opn., *post*, at p. 133), he suggests that our legal conclusion will inflict a mortal blow to the "need to preserve the initiative process" (*ibid.*), which he perceives to be "the last avenue by which ordinary citizens can effect political change." (*Id.* at p. 134.) However, even though stores in a shopping area like Fowler Center may not be compelled to allow signature gathering on their property, common sense suggests that, as a matter of goodwill, some will do so voluntarily. And it is an overstatement to suggest that there are no other areas in which signature gatherers can be successful. So our conclusion does not mean that the sky is falling on the initiative process.

Nevertheless, our colleague feels that courts "should be adopting rules of law that encourage rather than discourage the initiative process." (Conc. & dis. opn., *post*, at p. 135.) In this regard, he believes "a supermarket's interest in totally excluding speech from its vicinity is not strong." (*Id.* at p. 136.) Thus, "[w]ith the allowance of reasonable time, place and manner restrictions," he does "not see how there is a burden on a supermarket that outweighs the strong public interest in allowing free speech in the vicinity of its store." (*Id.* at p. 137.) We assume that, in referring to "speech in the vicinity of [the] store," he means expressive activity *on* the private property of the store—indeed, next to the entrance to the store as happened in this case.

In assessing the burden on a store like Albertson's, and the effectiveness of time, place, and manner restrictions, courts must keep in mind the significant implications of concluding private property has become the functional equivalent of a traditional town center. This determination affects not only signature gathering for initiative petitions, but other forms of expressive activity. Such private property could be used by individuals or groups to set up tables or carry signs voicing their views on a variety of matters on which persons strongly disagree, like advocates for or against a war in Iraq, for or against abortion, for or against restrictions on the ownership of firearms, et cetera.

Subject only to time, place, and manner restrictions, the owners of such private property may be compelled to associate with, and to assist, those who are disseminating ideas with which the property owners vehemently disagree.

And a finding that private property has become the functional equivalent of a traditional town center inevitably will impose on its owner the financial and emotional costs of defending against a lawsuit whenever the owner resorts to time, place, and manner restrictions to preclude its use for expressive activity. It takes little imagination to recognize that those precluded

from using the property to advance their views will accuse the property owner of impermissibly prohibiting the expressive activity based on the content of the message.

Therefore, courts must be very careful before proclaiming private property to be a place for expressive activity.

DISPOSITION

The judgment is affirmed.

Morrison, J., concurred.

**SIMS, J.,** Concurring and Dissenting.—I concur with the majority's affirmance of the judgment, but, with respect, I do not agree with the majority's reasoning. I think the free speech guarantees of the California Constitution protect against infringement by private citizens. I also think there has never been a time when the initiative process was more deserving of encouragement. However, this judgment must be affirmed on a narrow ground: appellants failed to prove that *this* Albertson's store had replaced the public downtowns of Nevada City and Grass Valley as a public forum. The trial court made a factual finding that, "No evidence established that Albertson's was a 'miniature downtown' as identified by the *Pruneyard* court [*Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [151 Cal.Rptr. 854, 592 P.2d 341]]." It is therefore appellants' failure of proof that requires affirmance of the judgment in this case.

I

*Article I, sections 2 and 3 of the California Constitution protect against infringement by private conduct*

A threshold question is whether the free speech clauses of the California Constitution (art. I, §§ 2, 3[1]) guard against infringement on speech only by the government, or also by private parties, such as Albertson's. (*Golden Gateway Center v. Golden Gateway Tenants Assn.* (2001) 26 Cal.4th 1013, 1022 [111 Cal.Rptr.2d 336, 29 P.3d 797] (*Golden Gateway*) [apartment landlord could prohibit tenants association from distributing newsletters by leaving them at apartment doors].) The California Supreme Court in *Golden*

---

[1] "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." (Cal. Const., art. I, § 2, subd. (a).) "The People have the right to . . . petition government for redress of grievances . . . ." (*Id.* § 3.)

*Gateway* was unable to reach consensus on the question of state versus private conduct. Justice Brown, joined in the lead opinion by Justices Baxter and Chin, concluded California's free speech clause (Cal. Const., art. I, § 2) contains a state action limitation. (*Golden Gateway, supra,* at pp. 1023, 1033.) Chief Justice George, concurring in the judgment on other grounds, considered it unnecessary to reach the question of a state action limitation. (*Id.* at p. 1036 (conc. opn. of George, C. J.).)

Most persuasive in my view, however, is the dissenting opinion of Justice Werdegar (joined by Justice Kennard and an assigned justice), that California's free speech clause, which is broader than the federal clause, has no state action limitation but rather " 'runs against the world, including private parties as well as governmental actors.' " (*Golden Gateway, supra,* 26 Cal.4th 1013, 1046-1047, 1054-1059 (dis. opn. of Werdegar, J.), citing *Gerawan Farming, Inc. v. Lyons* (2000) 24 Cal.4th 468, 492 [101 Cal.Rptr.2d 470, 12 P.3d 720].)

Justice Brown's lead opinion in *Golden Gateway* dismissed as "nonbinding dictum" *Gerawan*'s statement that California's free speech clause runs against the world including private parties, because the presence of a state actor was undisputed in the earlier case. (*Golden Gateway, supra,* 26 Cal.4th 1013, 1028-1029, 1047.) Justice Brown further stated: "In any event, the express repudiation of this language by one of the four signatories to *Gerawan* removes any impediment to reaching a different conclusion based on our careful consideration of the clause's text and history." (*Golden Gateway, supra,* 26 Cal.4th 1013, 1029.)

The "one of the four signatories to *Gerawan*," referred to by Justice Brown was, of course, Justice Brown herself, who had concurred in *Gerawan* without reservation only eight months earlier.

Justice Brown's assertion (without authority) in *Golden Gateway,* that her subsequent repudiation of *Gerawan* undermined *Gerawan*'s teaching, is contrary to law. Thus, "A rule of law established by a court of last resort, as a precedent, ordinarily cannot be changed or affected except by a controlling decision of such court.

"In the absence of such a controlling decision, the force of a decision as precedent under the stare decisis rule is not affected by the fact that certain justices subsequently withdraw their acquiescence in the decision . . . ." (21 C.J.S. (1990) Courts, § 144, p. 172; *Wisconsin Power & Light Co. v. City of Beloit* (1934) 215 Wis. 439 [254 N.W. 119, 122-123].) Thus, *Gerawan,* which was decided by four justices, carries more precedential weight than

the plurality opinion in *Golden Gateway*, which was decided by three justices. " '[A]ny proposition or principle stated in an opinion [of the Supreme Court] is not to be taken as the opinion of the court, unless it is agreed to by at least four of the justices. [Citations.]' " (*Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 829 [4 Cal.Rptr.2d 615, 823 P.2d 1216]; see also *Board of Supervisors v. Local Agency Formation Com.* (1992) 3 Cal.4th 903, 918 [13 Cal.Rptr.2d 245, 838 P.2d 1198].) And, although *Gerawan*'s teaching on the private interests protected by California's free speech guarantee is technically dictum, such dictum is usually highly germane and compellingly persuasive. (*People v. Miller* (1999) 69 Cal.App.4th 190, 200-201 [81 Cal.Rptr.2d 410].)

For these reasons, then, and the reasons stated in Justice Werdegar's dissenting opinion in *Golden Gateway*, I would follow *Gerawan* and conclude that article I, sections 2 and 3 of the California Constitution guarantee that the free speech rights of its citizens may not be unreasonably infringed by private interests. Otherwise, we would undermine many free speech guarantees we take for granted, for example, the right to speak on public issues in newspapers. We would also make it possible for corporations to fire employees for engaging in unpopular political speech in their private lives.

Consequently, considering California's constitutional free speech guarantees to run against the world, including private parties as well as government action, we should "balance the private and societal interest in [the] speech against any competing constitutional concerns," i.e., balancing the signature gatherers' wish to disseminate ideas with concern that these activities not interfere with normal business operations and property or privacy rights of occupants and owners. (*Golden Gateway, supra*, 26 Cal.4th 1013, 1049, 1052 (dis. opn. of Werdegar, J.), citing *Robins v. Pruneyard Shopping Center, supra*, 23 Cal.3d 899, 910-911 (*Pruneyard*).)

## II

*There are strong societal interests in allowing citizens to exercise their right of speech and petition in the vicinity of a supermarket such as Albertson's; however, the trial court's findings of fact require affirmance of the judgment*

In *Pruneyard*, our Supreme Court held that article I sections 2 and 3 of the California Constitution protected the gathering of signatures for a petition to the government in a privately owned shopping center. (*Pruneyard, supra,* 23 Cal.3d 899, 902.) The court noted that, "Members of the public are rightfully on Pruneyard's premises because the premises are open to the public during

shopping hours." (*Id.* at p. 905.) The same is true of Albertson's. On this point, I respectfully disagree with the majority's characterization of the Albertson's store as a "stand-alone" store. Assuming for the sake of argument that a stand-alone store would not be a quasi-public forum, this Albertson's is not a true stand-alone store. This Albertson's store, though it is freestanding, does not stand alone. It is part of a 14-acre (635,976 square feet) shopping center, the Fowler Center, which includes seven separate buildings (126,448 square feet) situated around the perimeter of a central parking lot for 650 vehicles. The "anchor" stores are Albertson's and a large freestanding hardware store. The other businesses in the shopping center are 10 other retail stores, five restaurants or food retailers, and five service businesses, including a travel agency, photo store, video library, and mail box rental.

It is anomalous to declare that a shopping center may constitute a public forum and then to exclude from that domain the sidewalks in the vicinity of the anchor business where most people go—the supermarket. It does sponsors of an initiative little good to be able to set up their table on the edge of a parking lot where they have, at best, minimal access to citizens on their way to shop in the supermarket.

However, *Pruneyard* also relied on the practical view that, "central business districts apparently have continued to yield their functions more and more to suburban centers." (*Pruneyard, supra,* 23 Cal.3d 899, 907.) The court continued, "The largest segment of the county's population is likely to spend the most significant amount of its time in suburban areas where its needs and wants are satisfied; and shopping centers provide the location, goods, and services to satisfy those needs and wants." (*Id.* at p. 907.)

However, in this case, appellants failed to carry their burden of proving that Albertson's had replaced the downtown business districts of Nevada City and Grass Valley as a public forum. On this note, the trial court found in its statement of decision, "There was no convincing evidence that the Albertson's Grass Valley store has replaced central business districts as a favored forum for public congregation. Other than passing observations with regard to the downtown areas, no substantial evidence was provided as to the use of downtown areas as locations for public forums. The evidence presented was [mere] conjecture. The court cannot conclude that '[t]he largest segment of the county's population is likely to spend the most significant amount of its time in suburban areas where its needs and wants are satisfied' and that the Albertson's store 'provides the location, goods, and services to satisfy those needs and wants.' *Pruneyard, supra,* 23 Cal.3d at p. 903." Contrary to appellants' contention at oral argument, substantial evidence in the record supports these findings.

It is upon this narrow ground—appellants' failure of proof—that the judgment must be affirmed. In my view, other supermarkets in other locations should view this case with caution, because different proof could well lead to a different result.

This is because the need to encourage *free* speech, and the initiative process in general, has never been greater.

Thus, in reaching the conclusion that a shopping center should constitute a public forum, *Pruneyard* said that the right of the people to petition government for a redress of grievances, guaranteed by article I, section 3 of our Constitution, "is . . . vital to a basic process in the state's constitutional scheme—direct initiation of change by the citizenry through initiative, referendum, and recall. [Citations.]" (*Pruneyard, supra,* 23 Cal.3d 899, 907-908.)

The need to preserve the initiative process has never been greater, because government at all levels in California has increasingly become subject to the domination and control of monied special interests, leaving the average citizen without an effective voice in government.

This circumstance is reflected in the findings and declarations of the Political Reform Act of 1974 (Gov. Code, § 81000 et seq.), itself adopted by initiative measure and stating in part: "The people find and declare . . . : [¶] . . . [¶]

"(c) Costs of conducting election campaigns have increased greatly in recent years, and candidates have been forced to finance their campaigns by seeking large contributions from lobbyists and organizations who thereby gain disproportionate influence over governmental decisions; [¶] . . . [¶]

"(f) The wealthy individuals and organizations which make large campaign contributions frequently extend their influence by employing lobbyists and spending large amounts to influence legislative and administrative actions . . . ." (Gov. Code, § 81001.)

Unfortunately, the 1974 reform act did not solve the problem of money influencing the making of laws in Sacramento; rather, the situation has only gotten worse. (See, e.g., *Nixon v. Shrink Missouri Government PAC* (2000) 528 U.S. 377, 390 [120 S.Ct. 897, 905-906, 145 L.Ed.2d 886] and authorities cited therein; Wertheimer & Manes, *Campaign Finance Reform: A Key to Restoring the Health of Our Democracy* (1994) 94 Colum. L.Rev. 1126, 1128-1131, and authorities cited therein; Michael & Walters, The Third

House (Berkeley Public Policy Press 2002); Maclean, *The Strong Arm of the Law* (Nov. 2002) Cal. Law., p. 24; Yamamura, *Guards' Union Hosts Legislators in Hawaii*, Sac. Bee (Dec. 5, 2002) p. A1; Hill, *So Far, Prisons Manage to Duck the Budget Ax*, Sac. Bee (Dec. 15, 2002) p. A1; Talev, *Davis Raised Record Amount*, Sac. Bee (Feb. 1, 2003) p. A1; Walters, *Davis' Budget Shows Who Has, and Doesn't Have, Real Clout*, Sac. Bee (Jan. 21, 2003) p. A3.)

Nor is the *local* political system immune from undue control by monied interests. The Sacramento Bee newspaper recently ran a series documenting the huge extent to which development interests contributed to the campaigns of members of local boards of supervisors, in order to gain "access" to those board members. (Korber, *Across the Region, Campaign Contributions are Pouring into Local Politics, and Some Say Special Interests are . . . Building Influence: Growth Lobby a Growing Business, Records Show*, Sac. Bee (Dec. 8, 2002) p. A1; Korber, *Developer Dollars Pour into Placer: The Growth Lobby is the Biggest Political Donor in the Fast-expanding County*, Sac. Bee (Dec. 9, 2002) p. A1; Korber, *In Region, Few Limits to Giving: Contribution Caps Can Blunt Special Interests' Influence, Backers Say,* Sac. Bee (Dec. 10, 2002) p. A1; Korber, *Campaign Limits Urged in Placer: A Supervisor Acts Following a Report That Developers are Big Givers,* Sac. Bee (Dec. 17, 2002) p. B1.)

In my opinion, a majority of Californians think that the current political system is unduly influenced by money. The reason that voting turnout has hit an all-time low (Vellinga, *County Predicts Lowest Turnout: Despite Some Key Ballot Measures, Voter Disillusionment is Expected to Keep Number at 50-55 Percent*, Sac. Bee (Nov. 4, 2002) p. B1; Smith, *November's Voter Turnout a New Low*, Sac. Bee (Dec. 17, 2002 p. A4) is that average citizens, who do not participate in the political process, believe that, in practical effect, their votes will not matter, because the political process is, in fact, ultimately controlled by big-money special interests. These average citizens therefore simply give up and stop voting. To quote a former politician turned statesman, "I share their pain." It is not hyperbole to say that democracy in California is in serious trouble.

It is in this context that the right to gather signatures for an initiative petition at a supermarket must be decided. For all its faults, the initiative process remains the last avenue by which ordinary citizens can effect political change.

The initiative process may be flawed and may itself be subject to considerations of financial wealth. Thus, "the enormous expense of collecting

signatures for initiative petitions has all but priced public interest nonprofit groups out of that procedure, even though the initiative was originally provided for in 1911 as part of a populist movement designed to preserve the power of such groups to counter wealthy lobbyists. See *The California Initiative Process: A Suggestion for Reform* (1975) 48 So.Cal.L.Rev. 922, 943-944." (*Coalition for Fair Rent v. Abdelnour* (1980) 107 Cal.App.3d 97, 107, fn. 4 [165 Cal.Rptr. 685].)

Nevertheless, the initiative process is the last refuge of representation of the interests and views of average people, as distinct from rich and powerful special interests. Thus, many of our most significant initiative measures were truly the result of populist movements that ultimately carried the day with California's electorate. These include Proposition 8 (The Victim's Bill of Rights), Proposition 13 (Jarvis-Gann Tax Limitations), Proposition 20 (California Coastal Commission), Proposition 215 (Medical Marijuana Initiative), and Proposition 184 ("Three Strikes"). (See, e.g. *Kennedy Wholesale, Inc. v. State Bd. of Equalization* (1991) 53 Cal.3d 245, 250 [279 Cal.Rptr. 325, 806 P.2d 1360] [noting populist theme of Proposition 13 ballot arguments].)

In this political environment dominated by monied special interests, we should be adopting rules of law that encourage rather than discourage the initiative process.

There is an additional policy reason why we should be encouraging a maximum amount of *free* speech: at the same time that our political process has become controlled by money, our very sources of information—of news—have also been increasingly controlled by those with great wealth.

"The twentieth century technological revolution has fundamentally altered the map of our trifurcated communications system [print, broadcasting, and common carriage]. The printing press has been replaced by the picture tube. The influence of the nation's 1,730 daily newspapers is dwarfed by that of nearly 10,000 commercial and educational radio stations, not to mention the gargantuan television networks with their myriad affiliates. . . . By 1977, broadcasting had grown to the point where the average American consumed four times as many words through the airwaves as through newsprint, and the disparity is increasing." (Tribe, American Constitutional Law (2d ed. 1988) Communication And Expression, § 12-25, pp. 1007, 1003, fns. omitted.)

At the same time that we are increasingly receiving our news from television and radio, the cost to buy a radio or television station is prohibitive for all but the most wealthy. Recent issues of the publication Broadcasting & Cable reflect a Yuba City radio station was sold for $3.8 million, a

Merced television station was sold for $33 million, and a Reno television station went for $41.5 million. (*Changing Hands* (Oct. 28, 2002; Oct. 14, 2002; Sept. 23, 2002) Broadcasting & Cable.)

Before 1987, the Federal Communications Commission (FCC) applied a "fairness doctrine," requiring broadcast media licensees (1) to provide coverage of vitally important controversial issues of interest in the community, and (2) to provide a reasonable opportunity for the presentation of contrasting viewpoints on such issues. (*Syracuse Peace Council v. F.C.C.* (D.C. Cir. 1989) 867 F.2d 654, 655.) In 1987, the FCC stopped applying the fairness doctrine. (*Id.* at pp. 655-656, 657.) The FCC's decision to dispense with the fairness doctrine has been upheld by the federal courts. (*Id.* at p. 669; *Arkansas AFL-CIO v. F.C.C.* (8th Cir. 1993) 11 F.3d 1430.)

Since the FCC abolished the fairness doctrine, owners of radio and television stations are not legally required to present points of view with which they disagree.

For the average citizen, access to mass communication is limited. You cannot write a letter to the editor of your local television station. It seems to me obvious that those with great wealth, who own the major media outlets, cannot be counted on gratuitously to broadcast information or opinion that is antithetical to their self-interest. (See generally Hobbes, Human Nature (1650) and Leviathan (1651).) It is therefore important to preserve the opportunity for average citizens to engage in *free* speech in locations which afford maximum exposure to the public, so that their views may be made known.

All these policy reasons, supporting recognition of a quasi-public forum in the vicinity of a popular supermarket, are crucial to the maintenance of a representative democracy in this state. On the other hand, a supermarket's interest in totally excluding speech from its vicinity is not strong. The exercise of free speech in a quasi-public forum is subject to "reasonable regulations adopted by [the property owner] to assure that these activities do not interfere with normal business operations . . . ." (*Pruneyard, supra,* 23 Cal.3d 899, 911; see also *Lushbaugh v. Home Depot U.S.A., Inc.* (2001) 93 Cal.App.4th 1159, 1169-1170 [113 Cal.Rptr.2d 700].) Thus, a supermarket may adopt reasonable time, place, and manner restrictions controlling the number of persons or groups that may be present outside the store at any given time. Also, if a citizen or group wanted to hand out leaflets in the vicinity of the store, a supermarket could lawfully require the citizen or group to clean up all leaflets or to pay a reasonable deposit to cover the supermarket's cost of cleaning up. A private supermarket should not bear the

cost of cleaning up after those who exercise free speech on its property. Rather, those who exercise speech in the vicinity of the store cannot interfere with normal business operations and should be responsible for any cost of their activity. With the allowance of reasonable time, place, and manner restrictions, I do not see how there is a burden on a supermarket that outweighs the strong public interest in allowing free speech in the vicinity of its store.

Accordingly, if those who wish to gather signatures for an initiative in the future can prove that a private supermarket has replaced the traditional public forum, I would hold that a private supermarket is a quasi-public forum for free speech purposes. It is of crucial importance that free speech in California remain *free*.

However, because appellants failed in their proof on a crucial issue, as I have discussed, the judgment is properly affirmed.

Appellants' petition for review by the Supreme Court was denied June 18, 2003. Kennard, J., and Moreno, J., were of the opinion that the petition should be granted.